**Henry DENKER, Plaintiff,**

v.

**Alfred UHRY, Warner Bros. Inc., the Zanuck Company, Richard D. Zanuck, Driving Miss Daisy Productions, United Artist Theater Circuit, Inc., Cineplex Odeon Corporation, American Multi-Cinema, Inc., General Cinema Corporation, Loew's Theatre Mngmnt. Corporation, and City Cinemas Corp., Defendants.**

**Henry DENKER, Plaintiff,**

v.

**Alfred UHRY, Playwrights Horizons, Inc., the Daisy Company, Ivy Properties, Ltd., Jane Harmon, Nina Keneally, Richard Frankel, Gene Wolsk, Alan M. Shore, and Susan S. Myerberg, Defendants.**

**Nos. 91 Civ. 0076(MBM), 91 Civ. 0077(MBM).**

United States District Court, S.D. New York.

Dec. 8, 1992.

Melvin L. Wulf, Lawrence S. Levine, Helen D. Reavis, Beldock Levine & Hoffman, New York City, for plaintiff.

Stephen F. Huff, Brad D. Rose, Pryor Cashman Sherman & Flynn, New York City, for defendants in 91 Civ. 0076.

Jay Cohen, Paul Weiss Rifkind Wharton & Garrison, New York City, for defendants in 91 Civ. 0077.

## OPINION AND ORDER

MUKASEY, District Judge.

In these copyright infringement actions, plaintiff Henry Denker, author of the novel *Horowitz and Mrs. Washington* and the play of the same title, sues defendant Alfred Uhry, author of the play *Driving Miss Daisy* and the screenplay of the same title, and others involved in the production and distribution of the play and film versions of *Driving Miss Daisy*. Defendants have moved jointly for summary judgment on the issue of improper appropriation. For the reasons set forth below, defendants' motion is granted.

### I.

Plaintiff is a respected and prolific author. He has written 24 novels, more than 1,000 scripts for radio and television, screenplays for three feature films and teleplays for 12 network specials. Seven of his plays have been produced on Broadway and two at the

Kennedy Center for Performing Arts in Washington D.C. Plaintiff's *Horowitz and Mrs. Washington,* the subject of these lawsuits, originally was published as a novel in 1979 by G.P. Putnam's Sons and then as a condensed book by Reader's Digest in 1980. Later rewritten for the stage, *Horowitz and Mrs. Washington* had a run of seven performances at the Joshua Golden Theater on Broadway in April 1980.

Alfred Uhry, a defendant in both actions, has been writing lyrics, plays and screenplays since 1958. *Driving Miss Daisy,* his Pulitzer Prize winning play, first was produced in New York by defendant Playwrights Horizons in 1987. The defendants in 91 Civ. 0077 were involved in the Playwrights Horizons production of Uhry's play. Adapted for the screen by Uhry in 1988, *Driving Miss Daisy* won four Academy Awards including Best Picture and Best Screenplay. The defendants in 91 Civ. 0076 produced and distributed the film.

### A. *Horowitz and Mrs. Washington*

Plaintiff's works depict the relationship between Samuel Horowitz, a crusty, bigoted, 72–year–old Jewish man and Harriet Washington, his black physical therapist. The play is set in New York City during July 1977. The action in the novel takes place over a few months sometime in the late 1970's.

Early in the novel, and at the beginning of the play, Horowitz, recovering from a stroke, is brought home from the hospital to his Upper West Side apartment by his son Marvin Hammond. Immediately apparent is Horowitz's hostility to the non-white, non-Jewish world. We learn at the outset that he believes, notwithstanding his doctor's insistence to the contrary, that his stroke was precipitated by an earlier mugging at the hands of a gang of "black bastards," and that his doorman, Juan, who refuses to accept a tip because of Horowitz's illness, is really a "[s]hrewd little Puerto Rican ... set[ting him] up for bigger tips." (Horowitz and

Mrs. Washington Novel at 35; Horowitz and Mrs. Washington Play at 7–8) [1].

Upon arriving at his apartment, Horowitz is horrified to learn that Marvin and his sister Mona Fields have hired Harriet Washington, a "schvartzer," to assist in his rehabilitation. (HMW Novel at 38). "You can't trust them!" he warns his son. "They mug me, slash me, give me a stroke...." (HMW Play at 10; HMW Novel at 39). Marvin, however, is adamant, and Horowitz relents when he learns the alternative is a nursing home.

The next few sequences in both novel and play depict Mrs. Washington's patient but firm attempts to overcome Horowitz's hostility and proceed with his physical therapy. Mrs. Washington, to whom Horowitz refers as the "Black Hitler," insists that Horowitz perform a variety of tasks designed to rehabilitate his hand and leg, including cutting his food, crumpling newspapers, shuffling cards, walking, and buttoning his clothes. The nature of Denker's work and its characters is illustrated by the following exchange from the play:

WASHINGTON: Now, time for our exercises!

HOROWITZ: Torture, you mean.

WASHINGTON: I know *one* exercise you don't need. Speech therapy. Now, dorsiflex that left foot.

HOROWITZ: Dorsi-what?

WASHINGTON: Lift your foot like this. Didn't they teach you at the hospital?

\*　　\*　　\*

HOROWITZ: And if I try I'll be able to dance in the ballet? (He barely raises it.) There! Better?

WASHINGTON: No!

HOROWITZ: Tell me, my dear Mrs. Washington, you ever had the ambition to run a concentration camp?

WASHINGTON: (She kneels to put pressure on his left calf) I'm going to press against this leg. I want you to raise it.

---

**1.** Subsequent references to plaintiff's works will appear as follows: (HMW Novel at ___) and (HMW Play at ___). Where both the play and novel are cited, direct quotes are from the first work cited, the second citation is to a corresponding similar passage. Stage directions often are omitted from quotes from the play.

(He tries unsuccessfully.) Again! (Another attempt.) Again! (Another attempt.)

HOROWITZ: If it isn't dorsi-flex, its again. The woman only knows two words!

WASHINGTON: Push. Hard as you can!

HOROWITZ: That's ... that's as hard as I can.

WASHINGTON: Tomorrow will be better. And now for your occupational therapy.

HOROWITZ: My occupation I already know. I used to be in wholesale paper and twine.

WASHINGTON: Manual dexterity, Mr. Horowitz. Proprioceptive Neuromuscular Facilitation.

HOROWITZ: There is nothing worse than an educated negro.

(HMW Play at 25–26). Despite Horowitz's offensive manner, Mrs. Washington refuses to quit because the job allows her to help her widowed daughter who is raising two children.

As the novel and play progress, Horowitz increasingly is impressed by Mrs. Washington's integrity and determination, and his attitude towards her gradually softens. During a visit to Central Park the two talk of the loss of their respective spouses. Later Horowitz, who is saddened by eating alone in the dining room where he used to eat with his wife, asks Mrs. Washington if she would join him for dinner. When Mrs. Washington agrees to have coffee while Horowitz eats, it is the first time she sees him smile. Eventually, as the friendship develops Horowitz's racial remarks become more humorous than hostile and he uses them, albeit awkwardly and insensitively, in an attempt to express his growing admiration for Mrs. Washington.

Later on in the two works, New York City erupts in rioting and looting during a city-wide electrical blackout. The following morning, Mrs. Washington returns to Horowitz's apartment visibly upset. Mrs. Washington's grandson Conrad, after listening to his grandmother's recent complaints of being unable to sleep because of the heat, tried to steal an air conditioner and was arrested. Moved by the story, Horowitz calls his son Marvin, a lawyer, and demands he help Conrad. When Mrs. Washington expresses her appreciation, Horowitz replies, it is "[l]ittle enough to do for a friend." (HMW Novel at 192, HMW Play at 36).

A lawyer from Marvin's firm secures Conrad's release with "just a warning." In the novel, Horowitz, Mrs. Washington and her grandchildren celebrate by having dinner at a French restaurant and attending a Shakespeare play in Central Park. In both the novel and play, Horowitz gives Conrad a gold coin that he received from his father on his bar mitzvah. He tells Conrad that when he is angered by his inability to be helpful to his mother and grandmother the coin will serve as a reminder that the answer is hard work. (HMW Novel at 203; HMW Play at 38).

A week later, Conrad is stabbed. In the novel, Horowitz rushes to Harlem Hospital, assuming that Conrad was injured in the course of a drug deal. There he finds Mrs. Washington, sitting on a chair next to Conrad's bed, crying. In a rage, Horowitz calls the boy an "animal" who "belongs in a cage." (HMW Novel at 230).

In the play, Horowitz tries to go to the hospital but cannot summon the strength. Instead, when Mrs. Washington arrives the next day, Horowitz tells her that she is "wasting her life on that boy," and insists that Conrad should be locked up with "the other animals." (HMW Play at 42). In both novel and play, the scene ends with Mrs. Washington telling Horowitz that Conrad was stabbed when two men attempted to steal the gold coin. In the novel, Horowitz apologizes. (HMW Novel at 232). In the play, Mrs. Washington storms out in anger. (HMW Play at 43–44).

Later that night, tired, alone and embarrassed, Horowitz deviates from his low cholesterol diet and orders a corned beef sandwich, coleslaw, pickles and a beer from a delicatessen. During the night, he is awakened by heartburn, and on his way to the bathroom to find an antacid, falls and loses consciousness. The next morning, Mrs. Washington finds Horowitz on the floor and, despite his protests, promptly calls the doctor, who alerts Marvin and Mona.

Later that day Horowitz's daughter Mona, "the Purim Queen of San Diego," calls to tell

Horowitz that she plans to move him to her home where he will receive constant care. Certain that San Diego is one step from the Hebrew Home for the Aged, Horowitz is terrified. Invoking images of Joshua and the creation, Horowitz vows to complete his rehabilitation in the week before Mona arrives and, with Mrs. Washington's help, begins the next phase of his rehabilitation with renewed enthusiasm. Mrs. Washington even participates in what turns out to be a slapstick rehearsal of Mona's visit.

By the time Mona arrives, her father has had a remarkable recovery. After giving Horowitz a battery of tests, his physician informs Mona that Horowitz is fit to resume his independent lifestyle in New York. Mona relents and returns to San Diego.

At the end of the novel and play, Mrs. Washington informs Horowitz that she must leave to care for other patients. Horowitz gives Mrs. Washington "her pinochle winnings"—a sizable gift for her grandchildren's education—and the two vow to remain friends. (HMW Play at 72). The novel's final scene occurs almost one year after Horowitz's stroke. Unbeknownst to Horowitz, Mrs. Washington watches as he walks to and from synagogue to honor the anniversary of his wife's death.

### B. *Driving Miss Daisy*

Uhry's *Driving Miss Daisy* tells the story of Daisy Werthan, an elderly, Jewish woman, and her 25–year relationship with Hoke Coleburn, her black chauffeur. Set in Atlanta between 1948 and 1973, *Driving Miss Daisy* is a distinctively southern story. Daisy is a refined southern woman, who, like Horowitz, is strong-willed and struggles to maintain her independence in the face of advancing age. Hoke, a product of the segregated south, is uneducated but possessed of a strong sense of dignity and, together with Daisy, adjusts to advancing age and changing times.

Uhry's works begin with Daisy, 72 years old, inadvertently putting her car in reverse and crashing into her neighbor's yard. In the next scene in the film, and the first in the

play, Daisy and Boolie, her 40–year–old son, argue about whether Daisy should continue to drive. Despite his mother's protests, Boolie hires Hoke Coleburn as her chauffeur.

Initially, Daisy ignores Hoke. She walks and takes public transportation rather than being driven. When Hoke attempts to perform household chores to relieve his boredom, Daisy demands that he stop. In both the movie and the play, Hoke eventually convinces Daisy to allow him to drive her to the supermarket. Daisy begins barking out orders from the moment she gets into the car. She accuses Hoke of speeding although he is driving 19 miles an hour in a 35–mile–an–hour zone; she becomes panic stricken when Hoke decides to take a more direct route to the supermarket than the one Daisy is used to; she demands he park the car in the shade; and she takes the keys when entering the supermarket. While Daisy is shopping Hoke calls Boolie to tell him he drove Daisy to the market: "Yassuh, only took six days. Same time it take the Lawd to make the worl'." (Driving Miss Daisy Play at 14; Driving Miss Daisy Screenplay at 34)[2]

In a subsequent scene, Daisy telephones Boolie early in the morning and insists that he come to the house immediately. When Boolie arrives, Daisy triumphantly displays evidence of a missing can of salmon as proof that Hoke is stealing from her. Shortly thereafter, Hoke arrives for work, and before either Daisy or Boolie can mention the missing salmon, Hoke hands Daisy a new can to replace the salmon he had eaten the previous day. An embarrassed Daisy quickly bids Boolie good-bye.

We next see Daisy tending to her husband's grave on what is referred to in the screenplay as a "full, fuzzy-green, warm morning." (DMD Screenplay at 44). She asks Hoke, who is standing nearby, to put a pot of azaleas on Leo Bauer's grave. Hoke cannot locate the Bauer grave and, deeply embarrassed, is forced to admit to Daisy that he is unable to read. Daisy, formerly an

---

**2.** Subsequent references to Uhry's works will appear as follows: (DMD Play at ____) and (DMD Screenplay at ____).

elementary school teacher, teaches Hoke to sound out the name Bauer. Throughout the works Daisy helps Hoke learn to read and write.

Several years after the incident in the cemetery, we join Hoke and Daisy driving to Boolie's home for his wife Florine's annual Christmas party. Daisy, upset that her Jewish son and daughter-in-law are celebrating Christmas, notes that Florine "makes an ass out of herself every year" by ostentatiously decorating her home with Christmas lights and wreaths, and tells Hoke that "if I had a nose like Florine I wouldn't go around saying Merry Christmas to anybody." (DMD Play at 19–20; DMD Screenplay at 52). As they are entering the house Daisy gives Hoke a copybook—"not a Christmas present"—which Daisy explains she used to teach her students to read and write. (DMD Screenplay at 55; DMD Play at 20).

A few years later, we see Hoke and Boolie discussing the new car Boolie bought for Daisy. Hoke tells Boolie he bought Daisy's old car from a dealer. Although he could have saved money by buying it directly from Daisy, Hoke tells Boolie "yo' mama in my business enough as it is. I ain' studyin' makin' no monthly car payments to her. Dis mine the regular way." (DMD Play at 22; DMD Screenplay at 58).

In the film we next see Daisy and Hoke on the way to Mobile, Alabama to visit Daisy's relatives. While they are picnicking on the side of the road two Alabama state troopers pull over. The troopers inspect Hoke's drivers license and the car registration. Walking away, one comments: "An old nigger and an old Jew woman takin off down the road together. Now that is one sorry sight." The other replies: "I'll tell you one sorrier. They're sitting in a Cadillac and I'm sittin' next to you." (DMD Screenplay at 66A).

Later in the journey, Hoke tells Daisy that he has to stop the car to "make water." When Daisy tells him to wait until they arrive. Hoke drives on a minute and then abruptly stops the car. He tells Daisy quietly but firmly: "I ain' no dog and I ain' no chile and I ain' jes' a back of the neck you look at while you goin' wherever you want to go. I am a man nearly seventy-two years old

and I know when my bladder full and I gettin' out dis car and goin' off down the de road like I got to do. And I'm takin' de car key dis time. And that's de end of it." (DMD Play at 26; DMD Screenplay at 70).

We next see Hoke in Boolie's office at the Werthan Company telling Boolie that Boolie's cousin Jeannette Lewis has offered him a job. Hoke indicates that it "got him thinking." When Boolie offers a raise to sixty-five dollars a week, Hoke counters with seventy-five and Boolie agrees. As Hoke leaves Boolie's office he tells him it "feel good" to have "people fightin' over you." (DMD Play at 27; DMD Screenplay at 77).

After an unstated passage of time, we join a frightened Daisy alone in her home during a winter ice storm. To Daisy's surprise, Hoke shows up for work. Because they are unable to drive, Daisy asks Hoke to keep her company for the day. He agrees and lights a fire. While Daisy "sits contented in her chair" the focus shifts to Boolie who is calling to check up on Daisy. (DMD Play at 29). He offers to visit her once the storm subsides, but Daisy declines because Hoke is with her. When Daisy describes Hoke as "very handy," Boolie is startled and remarks that he has never heard his mother "say loving things about Hoke before." (DMD Play at 29; DMD Screenplay at 84).

Some years later, Hoke and Daisy are caught in a traffic jam on the way to synagogue. Hoke, who has asked a police officer, informs Daisy that the synagogue was bombed. Distressed, Daisy vehemently insists that it must have been the conservative or orthodox synagogue, rather than the reform synagogue she attends, that was the intended target. Hoke replies: "It doan' matter to them people. A Jew is a Jew to them folks. Jes like light or dark we all the same nigger." (DMD Play at 30; DMD Screenplay at 86). Daisy begins to cry.

In the next sequence, Boolie tells Daisy that he cannot accompany her to a United Jewish Appeal dinner at which Martin Luther King will be speaking. Boolie explains that his business would be threatened if associates believed he supported Martin Luther King, and suggests that Daisy invite Hoke.

On the way to the dinner Daisy mentions the ticket to Hoke. Hoke, offended by the last-minute invitation, refuses: "Next time you ask me someplace, ask me regular.... Things changin', but they ain't change all that much." (DMD Play at 34; DMD Screenplay at 96).

Several years pass. Hoke arrives at the house to find Daisy, who is 90, overwrought. She is searching frantically for her students' homework and insists that she is late for school. After calling Boolie, Hoke calms Daisy down. Daisy eventually regains her composure and tells Hoke that he is her best friend. The scene fades with Daisy and Hoke silently holding hands.

The final scenes take place on Thanksgiving two years later. In the film, we first see the outside of Daisy's home with a real estate agent's "For Sale" sign on the lawn and a "sold" sticker pasted over the sign. Boolie, 65 years old, is walking through the house when Hoke, 85, enters. The two briefly walk through the house and then leave to visit Daisy who has been living at a nursing home. When they arrive the patients are finishing their dinner. Daisy is sitting at a table vacantly staring into space when Hoke and Boolie join her. When Daisy does not respond, Boolie starts to make some forced small talk with Hoke. Daisy, who either has been listening or has just become lucid, tells Boolie that Hoke has come to see her not him and sends Boolie to "charm the nurses." (DMD Play at 38; DMD Screenplay at 108).

Daisy, regaining for a moment her feisty manner, ensures that Boolie is still paying Hoke. Hoke notices that Daisy has not eaten her pumpkin pie. The play and movie close with Hoke carefully cutting the pie and feeding it to her.

## II.

Summary judgment historically has been withheld in copyright cases because courts have been reluctant to make subjective determinations regarding the similarity between two works. See Hoehling v. Universal City Studios, Inc., 618 F.2d 972, 977 (2d Cir.) (citing Arnstein v. Porter, 154 F.2d 464, 474 (2d Cir.1946)), cert. denied, 449 U.S. 841, 101 S.Ct. 121, 66 L.Ed.2d 49 (1980). However, "a court may determine non-infringement as a matter of law on a motion for summary judgment, either because the similarity between two works concerns only 'non –copyrightable elements of the plaintiff's work,' or because no reasonable jury, properly instructed, could find that the two works are substantially similar...." Warner Bros., Inc. v. Am. Broadcasting Cos., 720 F.2d 231, 240 (2d Cir.1983) (quoting Hoehling, 618 F.2d at 977) (emphasis in original)) (citation omitted), aff'g 530 F.Supp. 1187 (S.D.N.Y. 1982), after remand, 654 F.2d 204 (2d Cir.), aff'g and remanding 523 F.Supp. 611 (S.D.N.Y.1981).

 In order to establish infringement, "two elements must be proved: (1) ownership of a valid copyright, and (2) copying of constituent elements of the work that are original." Feist Publications, Inc. v. Rural Telephone Service Co., —— U.S. ——, ——, 111 S.Ct. 1282, 1296, 113 L.Ed.2d 358 (1991). As set forth in Judge Frank's opinion in Arnstein v. Porter, supra, the copying element of infringement itself is separable into two elements. First, plaintiff must prove that defendant actually used plaintiff's work as a source of material or ideas for his own work. That is, plaintiff must show copying, in the ordinary sense of the word. Id. 154 F.2d at 468; Walker v. Time Life Films, Inc., 784 F.2d 44, 48 (2d Cir.), cert. denied, 476 U.S. 1159, 106 S.Ct. 2278, 90 L.Ed.2d 721 (1986). Second, plaintiff must show enough similarity to raise an inference of copying. For the purposes of this motion only, defendants concede ownership and actual copying.

 The second element plaintiff must prove, and the element at issue here, is improper appropriation of copyrightable material. Walker, 784 F.2d at 48. Copying is actionable when defendant appropriates the economic value of the work as measured by the work's appeal to the public. If defendant has appropriated that value, he has undermined the incentive created by copyright law and has infringed plaintiff's copyright. Thus, to prevail, plaintiff must establish that, from the standpoint of the lay reader, the works are "substantially similar." Hoehling 618 F.2d at 977; Ideal Toy Corp. v. Fab–Lu Ltd.,

360 F.2d 1021, 1022 (2d Cir.1966); *Arnstein,* 154 F.2d at 473.

█ The protection afforded by copyright, however, does not extend to all aspects of an author's work. For instance, it is axiomatic that although the author's original expression is protected, others are free to use ideas expressed in a copyrighted work. 17 U.S.C. § 102(b); *Baker v. Selden,* 101 U.S. (11 Otto) 99, 25 L.Ed. 841 (1880). Similarly, facts are not copyrightable, regardless of the effort expended in their discovery. *Feist,* —— U.S. ——, 111 S.Ct. at 1287. Thus, in an action for infringement, it must be determined both whether the similarities between the works are substantial from the point of view of the lay reader and whether those similarities involve copyrightable material.

█ Plaintiff misinterprets the substantial similarity test and the legacy of *Arnstein.* First, plaintiff attempts to introduce expert testimony, the deposition of Richard Gilman, Chairman of the Department of Dramaturgy and Drama at the Yale School of Drama, on the issue of improper appropriation. *Curriculum Vitae,* Wulf Aff.Ex. D), and his insightful analysis of the similarities between the two works (*see* Wulf Aff. Ex. B), because substantial similarity is judged by the spontaneous response of the ordinary lay observer, expert analysis and "dissection," although perhaps admissible when useful, is irrelevant here. The proffered testimony does not deal with survey evidence or other material that might help gauge the response of the lay reader, nor are we dealing with esoterica targeted at a highly specialized audience. *Walker,* 784 F.2d at 51–52; *Sid & Marty Krofft Television Productions, Inc. v. McDonald's Corp.,* 562 F.2d 1157, 1164–65 (9th Cir.1977). Although expert testimony may point out similarities that prove actual copying, copying has been conceded for the purposes of this motion. Plaintiff's confusion may arise from courts' use of "substantial similarity" to designate both the similarity necessary to prove copying and the similarity that betrays improper appropriation. *See, e.g., Novelty Textile Mills, Inc. v. Joan Fabrics Corp.,* 558 F.2d 1090, 1092 (2d Cir.1977). As Professor Latman points out, such use of the term substantial similarity is misleading

not only in that it creates confusion between the "copying" and "improper appropriation" prongs of the *Arnstein* test, but also in that the similarity necessary to prove copying need not be substantial and need raise only an inference of copying. *See* Alan Latman, *"Probative Similarity" as Proof of Copying: Toward Dispelling Some Myths In Copyright Infringement,* 90 Colum.L.Rev. 1178, 1204 (1990); 3 *Nimmer on Copyright* ¶ 13.-03[A] at 13–23 (1991). In any event, when improper appropriation only is at issue, in works such as these, expert testimony, such as that introduced by plaintiff, is irrelevant.

Second, plaintiff cites *Arnstein* for the proposition that summary judgment on the issue of improper appropriation is inappropriate "if there is the slightest doubt as to the facts." 154 F.2d at 468. In *Arnstein* the Second Circuit reasoned that summary judgment in copyright actions should be avoided because juries are "peculiarly fitted to determine" the response of the lay public. *Id.* at 473.

█ The *Arnstein* court's conclusions regarding summary judgment, however, have been undermined by recent case law both on summary judgment in general and summary judgment in copyright actions in particular. The mere existence of disputed factual issues is no longer sufficient to defeat a motion for summary judgment. *Knight v. United States Fire Ins. Co.,* 804 F.2d 9, 11–12 (2d Cir.1986), *cert. denied,* 480 U.S. 932, 107 S.Ct. 1570, 94 L.Ed.2d 762 (1987). Regardless of whether an issue is triable by jury, to avoid summary judgment the disputed issues of fact must be "material to the outcome of the litigation," *id.* 804 F.2d at 11, and must be backed by evidence that would allow "a rational trier of fact to find for the nonmoving party." *Matsushita Electric Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 587, 106 S.Ct. 1348, 1356, 89 L.Ed.2d 538 (1986).

In fact, the Second Circuit has repudiated *Arnstein*'s "slightest doubt" standard, *Beal v. Lindsay,* 468 F.2d 287, 291 (2d Cir.1972), and has held that summary judgment on the issue of improper appropriation is warranted if the "similarity involves only '*non*–copyrightable elements of plaintiff's work,' or . . .

no reasonable jury, properly instructed, could find that the two works are substantially similar." *Warner Bros., Inc.*, 720 F.2d at 240 (quoting *Hoehling*, 618 F.2d at 977); *Durham Industries, Inc. v. Tomy Corp.*, 630 F.2d 905, 918 (2d Cir.1980).

Because the law requires the court to focus on the works at issue, plaintiff's reliance on other factors, particularly the genesis of several of Uhry's past works, is misplaced. Plaintiff devotes much of his argument to describing several instances when Uhry was commissioned to adapt the work of other authors for presentation on the stage or screen. (Pltf.Mem. at 4–8). Presumably, plaintiff would have me conclude that because Uhry has rewritten the works of others in the past, he necessarily based *Driving Miss Daisy* on *Horowitz and Mrs. Washington* or is incapable of creating a wholly original work. In addition to the fact that the proffered conclusions do not follow from the underlying premise, whether or not Uhry spent his career adapting the works of others is immaterial to the question of whether, based on a comparison of the two works, a reasonable juror could find that *Driving Miss Daisy* contains copyrightable elements of plaintiff's works or that it is substantially similar to plaintiff's works. I now turn to the relevant inquiry—that is, a comparison of the works at issue.

## A. Theme

The summary judgment standard is easier stated than applied. There is no bright line rule to distinguish between idea and expression, and in comparing works of fiction the distinction "is especially elusive." *Hoehling*, 618 F.2d at 978. The inquiry, however, is not without its guiding principles. In *Nichols v. Universal Pictures Corp.*, 45 F.2d 119, 121 (2d Cir.1930), *cert. denied*, 282 U.S. 902, 51 S.Ct. 216, 75 L.Ed. 795 (1931), Judge Learned Hand wrote:

> Upon any work, and especially upon a play, a great number of patterns of increasing generality will fit equally well, as more and more of the incident is left out. The last may perhaps be no more than the general statement of what the play is about, and at times consist of only its title; but there is a point in this series of abstractions where they are no longer protected, since otherwise the playwright could prevent the use of his 'ideas,' to which apart from their expression, his property is never extended.[3]

*See also* Z. Chafee, *Reflections on the Law of Copyright*, 45 Col.L.Rev. 503, 513 (1945) ("protection covers the 'pattern' of the work . . . the sequence of events and the development of the interplay of characters"). In *Nichols*, a case also involving ethnic conflict depicted on the stage and screen, the plaintiff, author of *Abie's Irish Rose*, alleged that defendant's motion picture *The Cohens and the Kellys* infringed her copyright. Both works involved a "quarrel between a Jewish and Irish father, the marriage of their children, the birth of grandchildren and a reconciliation." 45 F.2d at 122. Concluding that the works expressed similar ideas in dissimilar fashion, the Court held:

> A comedy based on conflicts between Irish and Jews, into which the marriage of their children enters, is no more susceptible to copyright protection than the outline of Romeo and Juliet.

*Id.*

▇ In the case at hand, as in *Nichols*, there are indeed similarities between the works. Each is about an elderly, white Jewish person, who, in the face of advancing age and resulting loss of independence, requires the assistance of a black helper, and after initial resistance, develops a friendship with the helper. Beyond this level of abstraction, however, the works are markedly dissimilar.

*Horowitz and Mrs. Washington*, which spans one month in the play and several months in the novel, tells the story of the crass, opinionated Horowitz, who with Mrs. Washington's help quickly overcomes his prejudice and the physical handicaps and threatened loss of independence caused by

---

**3.** *But see Peter Pan Fabrics, Inc. v. Martin Weiner Corp.*, 274 F.2d 487, 489 (2d Cir.1960), where Judge Hand appeared to deprecate the value of *any* principle, including presumably his own:

"Obviously no principle can be stated as to when an imitator has gone beyond copying the 'idea,' and has borrowed its 'expression.' Decisions must therefore inevitably be *ad hoc.*"

age. Evident throughout the work are racial tensions as they occur in the cultural and ethnic mix of New York City. In addition to Horowitz's overt racism, such tensions manifest themselves in the urban problems that form the background of the work such as the street crime that is the cause of much of Horowitz's fear and which has taken the life of Mrs. Washington's son-in-law.

By contrast, *Driving Miss Daisy* spans 25 years in the deep south and although plaintiff relies heavily on the fact that it too depicts the development of a friendship between an elderly Jewish character and a black helper, *Driving Miss Daisy* is defined by its setting. The political and social climate in the postwar South is evident in all aspects of the work from the character's personalities—Daisy's refinement, Hoke's lack of education and initial subservience—to the events that cause that relationship to develop—the bombing of the synagogue, the racism of the state troopers, Martin Luther King's speech. Similarly, because of the 25-year span of the work, the theme of aging is expressed differently. Whereas Horowitz is handicapped by the sudden onset of illness and eventually regains his independence, in *Driving Miss Daisy* the audience sees Hoke and Daisy age slowly over time with the inevitable result that at the works' close Daisy, unlike Horowitz, is unable to overcome the physical effects of her advanced age.

Plaintiff is correct in his assertion that racism is a major theme in both *Horowitz and Mrs. Washington* and *Driving Miss Daisy*. However, the expression of this theme differs. Horowitz is knowingly and overtly racist, believing that the men who assaulted him and the residents of Harlem who took advantage of the blackout to loot and riot are typical of all blacks. Eventually, through his interaction with Mrs. Washington, he learns "that you c[an] no more make a general rule about blacks than you c[an] about Jews." (HMW Novel at 25). Daisy, by contrast, resists all suggestions that she harbors racist attitudes. When Boolie compares her resistance to Hoke to the racism of other southern whites, she responds: "Why, Boolie! What a thing to say! I'm not prejudiced! Aren't you ashamed?" (DMD Play at 7). Yet, evident in instances such as Daisy's inability to invite Hoke to the Martin Luther King dinner, is that Daisy has to some extent been affected by her environment. The overt racism in *Driving Miss Daisy* comes from outside the relationship in the attitude of the state troopers and the bombing of synagogue and forms the background of the work. *Driving Miss Daisy* is concerned primarily with Daisy's growing awareness of her own attitudes and eventual ability to recognize Hoke as a friend, set against this background. In essence, unlike plaintiff's works, Uhry's works address the racism in a society in addition to the racism in a particular person.

## B. Total Concept and Feel

The works also differ in total concept and feel; such a difference provides a proper basis for determining that a defendant's work does not infringe a plaintiff's. *Reyher v. Children's Television Workshop*, 533 F.2d 87, 92 (2d Cir.), *cert. denied*, 429 U.S. 980, 97 S.Ct. 492, 50 L.Ed.2d 588 (1976). Despite its serious themes, *Horowitz and Mrs. Washington* is principally a comedy. Horowitz, although a bigot, is a comedic character. His racial and ethnic slurs, interaction with Mona, temper tantrums and social commentary on topics ranging from detente to *The New York Times* are used by Denker for comedic purposes as well as to establish Horowitz's ignorance and insensitivity. By the end of the works, as evident in the rehearsal for Mona's arrival, even the normally proper Mrs. Washington joins in some of Horowitz's antics. By contrast, *Driving Miss Daisy* is more of a poignant and sentimental work. Conspicuously absent in defendants' works is the television situation comedy tone so prevalent in *Horowitz and Mrs. Washington*.

## C. Plot

Plaintiff attempts to overcome these differences in theme, setting and tone by pointing to certain discrete similarities between the works. The purported similarities, however, either involve unprotected *scenes a faire*— "scenes that necessarily result from the

choice of a setting or situation," *Walker*, 784 F.2d at 50—or are not similarities at all.

Plaintiff points out that each of the works opens with an "accident" befalling the main character. Notwithstanding plaintiff's recommendation that the Court "take judicial notice of the common use of the term 'cerebral accident' to refer to a stroke" (Pltf.Mem. at 24 n. 10), to claim that the events are similar in that both are "accidents" is less an argument than a pun; the events are distinct not only as expression but also in the ideas they express. Horowitz is mugged and subsequently suffers a stroke while Daisy inadvertently drives her car into her neighbor's yard. These are not similar events. Further, the underlying ideas are dissimilar. Although in both *Horowitz and Mrs. Washington* and *Driving Miss Daisy* these events give rise to the need for a helper, Horowitz overcomes the physical effects of the stroke whereas Daisy's accident is the first manifestation of the aging process that ultimately destroys her independence. Thus, at most plaintiff has alleged that Uhry used a somewhat similar plot device to that employed in *Horowitz and Mrs. Washington*, which does not constitute infringement.

Similarly, plaintiff maintains that the plot device used by Uhry to depict Hoke's devotion to Daisy is identical to that used by plaintiff to depict Mrs. Washington's loyalty to Horowitz. In plaintiff's work, Mrs. Washington travels to Horowitz's apartment despite a citywide power outage and climbs 11 flights of stairs to do so. In what plaintiff characterizes as a remarkably similar scene, Hoke reports for work despite an ice storm and hazardous driving conditions. Although plaintiff is correct in the sense that in both works the helper demonstrates loyalty by traveling to work at some personal risk, such generalized plot devices, like the so-called "accidents" discussed above, are not entitled to copyright protection. In *Smith v. Weinstein*, 578 F.Supp. 1297 (S.D.N.Y.), *aff'd without op.*, 738 F.2d 419 (2d Cir.1984), both plaintiff's screenplay and defendant's allegedly infringing movie included scenes wherein convicts escaped during a rodeo. In granting summary judgment for defendant, Judge Sofaer reasoned that "the development of the rodeo as an escape vehicle is protectible, but only at a level that particularizes the general into characters, details, and events." *Id.* 578 F.Supp. at 1303. Here defendant Uhry's use of a plot device that differs as to "characters, details, and events" does not amount to infringement. Plaintiff is not entitled to copyright protection for all instances of misfortune that befall the elderly or all demonstrations of dedication by a servant or helper.

I fail also to see a similarity in expression between Mrs. Washington surreptitiously watching Horowitz walk to synagogue at the end of *Horowitz and Mrs. Washington* and Hoke visiting Daisy at the nursing home at the end of *Driving Miss Daisy*. Although both are methods of expressing the helper's devotion, it is clear that this idea is expressed in dissimilar fashion. In fact, the differences underscore the authors' divergent treatment of the age theme. Mrs. Washington can watch from afar because she has helped Horowitz regain his independence and her assistance is no longer needed. Uhry, however, depicts age as depriving Daisy of her independence. Hoke, himself unable to drive because of failing eyesight, must feed his friend who, because of physical infirmities caused by age, is unable to care for herself.

Plaintiff relies on several other similarities between the works that amount, if anything, to similarities in general themes or ideas. For instance, citing Daisy teaching Hoke to read and write and Horowitz giving Mrs. Washington a check to further the education of her grandchildren, plaintiff argues that "striking is the fact that they [Daisy and Horowitz] assist both Hoke and Mrs. Washington in ways that are educational." (Pltf.Mem. at 47). Plaintiff also points to the fact that both Hoke and Mrs. Washington previously had worked for Jewish families. In *Driving Miss Daisy* Uhry's only use of this fact is when Hoke tells Boolie that he worked for Judge Stone for seven years and finds that despite what people say, Jews are quite generous. By contrast, it is evident in plaintiff's works that Mrs. Washington has a genuine appreciation for Jewish culture. While in the employ of the Rosengartens, or in the play the Schenks, Mrs. Washington took the time not only to learn to cook tradi-

tional dishes which she serves to Horowitz but also to learn about Jewish culture. Plaintiff uses this as a foil for Horowitz's racism. For instance, early in the play, Mrs. Washington tells Horowitz a story about a *tzaddik,* a righteous scholar, which she learned while working for the Schencks. Horowitz, angry at what he perceives as Mrs. Washington's flippant reference to the *tzaddik,* explains that a *tzaddik* is "[a] scholar, a philosopher, with enormous love of all God's creatures, even the smallest." Mrs. Washington retorts: "And the blackest?" Again, although plaintiff may have established that the works used like themes or ideas, here the helper's previous exposure to Jews and Judaism, the expression differs. (HMW Play at 14).

The remainder of the similarities alleged by plaintiff involve *scenes a faire*—incidents or events that necessarily follow from a common theme or setting. *Reyher,* 533 F.2d at 91; 3 *Nimmer on Copyright* ¶ 13.03[B] at 13–70 (1991). It is well-accepted that copyright protection, does not extend "to 'stock' themes commonly linked to a particular genre." *Walker,* 784 F.2d at 50; *see also Hoehling,* 618 F.2d at 979 ("it is virtually impossible to rely on a particular historical era or fictional theme without employing 'stock' or standard literary devices").

Plaintiff relies on passages from *Driving Miss Daisy* which, although similar to passages in *Horowitz and Mrs. Washington,* constitute *scenes a faire.* When Boolie insists that Daisy hire a chauffeur, the following exchange occurs:

BOOLIE: Daddy left you plenty enough for this. I'll do the interviewing at the plant. Oscar in the freight elevator knows every colored man in Atlanta worth talking about. I'm sure in two weeks time I can find you somebody perfectly—

DAISY: No!

BOOLIE: You won't even have to do anything, Mama. I told you. I'll do all the interviewing, all the reference checking, all the—

DAISY: No. Now stop running your mouth! I am seventy-two years old as you so gallantly reminded me and I am a widow, but unless they rewrote the Constitution and didn't tell me, I still have my rights. And one of my rights is the right to invite who I want—not who you want—into my house. You do accept the fact that this is my house? What I do not want—and absolutely will not have is some—(She gropes for bad enough word.) some chauffeur sitting in my kitchen, gobbling my food, running up my phone bill. Oh, I hate all that in my house!

BOOLIE: You have Idella.

DAISY: Idella is different. She's been coming to me three times a week since you were in the eighth grade and we know how to stay out of each other's way. And even so there are nicks and chips in some of my wedding china and I've seen her throw silver forks in the garbage more than once.

(DMD Play at 6–7; DMD Screenplay at 20–21). Later, when Daisy calls Boolie to report Hoke's theft of a can of salmon the following exchange takes place:

BOOLIE: You mean he stole a can of salmon?

DAISY: Here it is! Oh I knew. I knew something was funny. They all take things, you know. So I counted.

BOOLIE: You counted?

DAISY: The silverware first and the linen dinner napkins and then I went into the pantry. I turned on the light and the first thing that caught my eye was a hole behind the corned beef. And I knew right away. There were only eight cans of salmon. I had nine. Three for a dollar on sale.

(DMD Play at 16; DMD Screenplay at 42). Plaintiff compares this dialogue to exchanges between Horowitz and Marvin. Like Daisy, Horowitz resists having a helper:

HOROWITZ: What's wrong with Bernadine? She worked for your mother for twelve years and then for me.

MARVIN: Bernadine is a fine cleaning woman. But she knows nothing about physical therapy.

(HMW Play at 9). Horowitz's resistance intensifies when he learns Mrs. Washington is black:

HOROWITZ: I don't want her in this house!!!

MARVIN: But, Pa, Bernadine is black too.

HOROWITZ: Bernadine is different. A fine, warm, human being. And you don't have to count the silverware when she leaves at the end of the day!

(HMW Play at 10). When Dr. Tannenbaum informs Horowitz that he is going to tell Marvin about Horowitz's fall, Horowitz like Daisy invokes the Constitution:

HOROWITZ: Tell me, doctor, at what age does a man lose his right to decide what's for his own good? Is there some law? Something written in the Bible? In the Constitution? Something that says everybody can tell me what's for my own good.

(HMW Novel at 261).

The above passages are indeed similar. Daisy and Horowitz exhibit the belief that Hoke and Mrs. Washington will steal from them, that their already trusted domestic employees are "different" from other blacks, and both refer to the Constitution in resisting their sons' meddling. However, the irrational belief that members of other racial groups are prone to steal is a common manifestation of racial prejudice. In works depicting an elderly character's resistance to hiring a member of a minority group as a domestic, it is unsurprising that the character would fear theft, especially of "the silverware," the one household item stereotypically considered the target of unscrupulous servants. Similarly, it is common for the bigot to distinguish those members of a racial group with whom he is acquainted from the remainder of the group, as in "Of course I'm not prejudiced; why, some of my best friends...." Thus, plaintiff's use of such material is not copyrightable. Nor can plaintiff claim that Horowitz's reference to the Constitution, a document often invoked by people asserting rights of any sort, is subject to copyright protection. *See Walker*, 784 F.2d at 50 ("Elements such as drunks, prostitutes, vermin and derelict cars would appear in any realistic work about the work of policemen in the South Bronx."); *Warner Bros., Inc. v. American Broadcasting Cos.*, 654 F.2d 204, 210 (2d Cir.1981) (superhero shown lifting a car with one hand is a stereotypical means of demonstrating strength);

*Gibson v. C.B.S., Inc.*, 491 F.Supp. 583, 586 (S.D.N.Y.1980) (occurrences such as lying under a chicken, sitting in a refrigerator, and facing the possibility of being scrambled are "fairly predictable and usual in the life of an egg").

Thus, although the quoted dialogue from *Driving Miss Daisy* is similar to passages in plaintiff's works, the passages in *Horowitz and Mrs. Washington* are unprotectible *scenes a faire* and cannot be the basis of an action for infringement.

Because, based on the differences discussed above, no reasonable juror could find the works substantially similar and because the few similarities between *Horowitz and Mrs. Washington* and *Driving Miss Daisy* involve non-copyrightable elements of plaintiff's work, summary judgment on the issue of improper appropriation of the work as a whole is warranted. *See Warner Bros.*, 720 F.2d at 240.

### D. Characters

Nor has plaintiff established that the characters in *Driving Miss Daisy* are substantially similar to the characters in *Horowitz and Mrs. Washington*. The protection afforded characters depicted in a creative work is limited. Once again, Judge Hand's opinion in *Nichols* supplies the guiding principles:

If Twelfth Night were copyrighted, it is quite possible that a second comer might so closely imitate Sir Toby Belch or Malvolio as to infringe, but it would not be enough that for one of his characters he cast a riotous knight who kept wassail to the discomfort of the household, or a vain and foppish steward who became amorous of his mistress. These would be no more than Shakespeare's "ideas" in the play, as little capable of monopoly as Einstein's Doctrine of Relativity, or Darwin's theory of the origin of the species.

45 F.2d at 121. Ultimately, then, the inquiry, whether applied to plot or characters, is the same: the court must determine whether defendant has so invaded plaintiff's work as to appropriate plaintiff's expression. Expression, as it must, remains for the most part undefined, except only as it is distin-

guished from uncopyrightable ideas or *scenes a faire*, concepts which themselves resist precise definition or easy application. Refining the inquiry as to characters, the Second Circuit has stated:

> Stirring one's memory of a copyrighted character is not the same as appearing to be substantially similar to that character, and only the latter is infringement.

*Warner Bros. Inc.*, 720 F.2d at 242; *see also Smith*, 578 F.Supp. at 1303 ("No character infringement claim can succeed unless plaintiff's original conception sufficiently developed the character, and defendants have copied this development and not merely the broader outlines.").

Plaintiff contends that the following characters are substantially similar: (1) Daisy Werthan and Samuel Horowitz; (2) Hoke Coleburn and Harriet Washington; (3) Boolie Werthan and Marvin Hammond; and (4) Florine Werthan and Mona Fields.

Daisy and Horowitz share certain traits. Elderly, Jewish and strong-willed, they both mistrust their black helpers and actively resist encroachment on their independence. These shared traits, however, are expressed in different ways. Horowitz, aggressive, opinionated and overbearing, is, at his most presentable, a cantankerous old man. His overt racism and emotional outbursts pervade plaintiff's work. Daisy, by contrast, is a refined southern woman. Unlike Horowitz, Daisy avoids expressing her prejudices—certainly less pronounced in any event than Horowitz's—and in fact denies that she is prejudiced at all. Further, her reserve hinders her ability to express emotion. For instance, although Horowitz is able quickly to refer to Mrs. Washington as a friend, it takes Daisy much longer either to develop or perceive such feelings for Hoke. It is not until 18 years after the relationship begins, when Daisy is threatened with the loss of her relationship with Hoke due to her failing health, that she can do more than refer to Hoke as "handy" and actually call him her friend. Daisy, reserved and unemotional, and Horowitz, combative and comedic, are by no means substantially similar.

Nor are Mrs. Washington and Hoke substantially similar. Mrs. Washington, educated and self-assured, is able to withstand and counter Horowitz's repeated verbal assaults from the outset. On the other hand, Hoke, the victim of segregation, is uneducated and lacking self-confidence, and *Driving Miss Daisy* is, to some extent, the story of his development as well as Daisy's. Hoke slowly develops self-confidence and progresses gradually from his initial subservience to being able to stand up to Daisy as in the scenes where he insists on stopping the car and taking the key on the way to Mobile and later when he declines Daisy's invitation to the Martin Luther King speech. The similarities referred to by plaintiff—that they both are black, are hired to render assistance to an elderly Jewish person, develop a friendship with their employer and refer to having some kind of relationship with their children and grandchildren—are broad, unprotectible character outlines; they mark where the similarities end.

Plaintiff attempts also to establish that the supporting characters in *Driving Miss Daisy*, Boolie and Florine, Daisy's son and daughter-in-law, are substantially similar to Marvin and Mona, Horowitz's children. Plaintiff's characters, however, are not only dissimilar to Uhry's characters but seem undeveloped to the point of being "stock" characters and therefore ineligible for copyright protection. *Jones v. C.B.S., Inc.*, 733 F.Supp. 748, 753 (S.D.N.Y.1990).

Marvin appears briefly in plaintiff's work. In the beginning he convinces his father to give Mrs. Washington a chance; later we briefly hear Horowitz on the phone demanding that Marvin give legal assistance to Conrad, Mrs. Washington's grandson. Marvin also makes an appearance at the end of the work; after Dr. Tannenbaum examines Horowitz, Marvin helps convince Mona to allow Horowitz to remain in New York. On the whole we learn little about Marvin, other than that he is concerned with his father's well-being but, as a graduate of the Harvard Law School, naturally is too occupied with his supremely successful legal practice to spend time with his father. Such a character is too ill-defined to merit copyright protection.

**736**

In any event, Boolie, a well-developed character, is quite dissimilar. He repeatedly checks on his mother, helps organize her affairs, attends Idella's funeral, mediates between his wife and his mother, serves as an intermediary between Daisy and Hoke and, as where he suggests Daisy invite Hoke to the Martin Luther King dinner, plays an active role in fostering the relationship between the two main characters. Further, the audience observes Boolie aging along with his mother and Hoke and the problems he faces in helping his mother adjust to her advancing age. Thus, unlike Marvin who appears only briefly, Boolie is an integral part of *Driving Miss Daisy*.

Plaintiff claims also that Mona Fields, Horowitz's daughter, and Florine Werthan, Daisy's daughter-in-law, are substantially similar. Both are depicted as active in a variety of community events and organizations and often are referred to by the main characters in a sarcastic manner. This, however, is where the similarities end.

What little we learn of Mona, the overly protective daughter, differs from what we learn of Florine, the uncaring daughter-in-law. Mona closely monitors her father's care and attempts to have him relocate, against his will, to San Diego where she can keep a closer watch on his rehabilitation. Mona, in Horowitz's words, "the Sarah Bernhardt of San Diego," is involved in several community organizations and causes, particularly Jewish organizations such as Hadassah and the Hebrew Home for the Aged. Florine, on the other hand, is unconcerned about Daisy's well-being and is even admonished by Boolie for her "sniping at Mama." (DMD Screenplay at 51). Rather than involvement in Jewish organizations, Florine's "idea of heaven on earth," in Daisy's view, is "[s]ocializing with Episcopalians," and although involved in the Garden Club and the Junior League, "she'd die before she'd fix a glass of iced tea for the Temple Sisterhood!" (DMD Play at 7, 20; DMD Screenplay at 6). Thus, although both Mona and Florine are characters who cause difficulties for Horowitz and Daisy respectively, that are by no means substantially similar.

Because plaintiff has not established any similarities between the characters in *Horowitz and Mrs. Washington* and the characters in *Driving Miss Daisy* beyond unprotectible ideas and broad character outlines, summary judgment on the issue of infringement of characters is appropriate.

\* \* \*

For the reasons stated above, summary judgment in both actions is warranted on the issue of improper appropriation, and the complaints are dismissed.

SO ORDERED.