Christopher ROBINSON, Plaintiff,

v.

NEW LINE CINEMA CORPORATION, et al., Defendants.

No. Civ. AMD 97–3859.

United States District Court,
D. Maryland.

April 13, 1999.

Francis Joseph Gorman, Paul A. Chin, Gorman & Williams, Baltimore, MD, for plaintiff.

Nell B. Strachan, Dino S. Sangiamo, Melissa F. Cordish, Veronica P. Jones,

Venable, Baetjer & Howard, Baltimore, MD, for defendants.

## MEMORANDUM

DAVIS, District Judge.

Christopher Robinson ("Robinson") has brought this copyright infringement action against New Line Cinema Corporation and New Line Productions, Inc. (together,"New Line"), Peak Productions, Inc. and its owners Oren Koules and Dale Pollock, and screenwriters Takashi Bufford and Kate Lanier.[1] Robinson alleges that defendants' movie "Set it Off" infringes the copyright in his screenplay, "Sister Sarah," in violation of 17 U.S.C. § 101 et seq. Robinson has also alleged claims of unfair competition under the Lanham Act, 15 U.S.C. § 1025 et seq., and under Maryland law. Pending before the court is defendants' motion for summary judgment. The issues were extensively briefed and a hearing was held on April 9, 1999. For the reasons discussed below, I shall grant defendants' motion for summary judgment.

## I. FACTS

The material facts are undisputed or, if disputed, shall be set forth in the light most favorable to plaintiff. Because Robinson has sued various individuals and entities, a short description of each party's role in the production and creation of "Set it Off" is helpful in clarifying the litigation. New Line released and distributed the film "Set it Off" and its home video counterpart. Peak Productions was responsible for producing and financing the film. Koules and Pollock were the co-owners of Peak Productions during the making of

"Set it Off." Bufford wrote the screenplay on which the movie is based.[2] At the time he submitted the "Set it Off" screenplay to New Line, Bufford was not a New Line employee. Lanier was hired by New Line in June 1995 as a "script doctor" in order to improve the Bufford script. Finally, Helena Echegoyen, who is not a defendant, served as the Creative Executive in the Productions Department at New Line during the time "Set it Off" was developed. She contributed creative ideas to Bufford's screenplay.

### A. "Sister Sarah"

In 1992, Robinson, a Maryland native, wrote a screenplay about six young women,[3] who commit various robberies, entitled "Sister Sarah."[4] Robinson became inspired to write the screenplay after observing a group of young African American women near Lexington Market, a Baltimore landmark. Robinson sought unsuccessfully to obtain private financing to make the movie from his family, close friends and the Maryland film commission.[5]

In August 1993, Robinson contacted New Line and spoke with Amy Labowitz, then the Manager of the Acquisitions Department. Labowitz's main responsibilities included obtaining film projects to be released by New Line and its affiliates. Labowitz informed Robinson that unsolicited works, like Robinson's, must be submitted to New Line through an agent or a lawyer. Accordingly, Robinson's attorney, Grubb, submitted the "Sister Sarah" screenplay and a demo reel of Robinson's work to Labowitz.

---

**1.** Robinson also named Allen Alsobrook and Mary Parent, who are employees of New Line, as defendants, but the claims against them have been dismissed.

**2.** Bufford was also the credited screenwriter for "House Party III," "Booty Call," and "The Tiger Woods Story."

**3.** Five of the women are African American and one is Caucasian.

**4.** This is Robinson's first screenplay. The majority of Robinson's experience is in directing music videos. Robinson registered "Sister Sarah" with the Writer's Guild of America on August 12, 1993. He obtained a copyright for the screenplay on November 5, 1996.

**5.** In December 1994, Robinson was able to obtain financing in order to create a trailer for the screenplay.

After receiving Robinson's script, Labowitz gave the script to the Acquisitions Coordinator, who entered the submission information into a computer database. "Sister Sarah" was then assigned to an independent "reader," in this instance, Jonathon Ross, who read the script and assessed its strengths and weaknesses. Ross gave "Sister Sarah" a negative assessment, prompting Labowitz, in turn, to recommend that New Line pass on the script. Labowitz returned the script to Grubb in September 1993.

"Sister Sarah" is a story of six young women who commit robberies "to escape their life of poverty."[6] *See* Pl.'s Memo Opp'n Summ.J. at 1. The screenplay takes place in Baltimore, and opens with five of the women, Shay, Coco, Neicey, Paris, and Fawn, disguised as men, robbing a jewelry store. Because the police are looking for five men, the women escape detection, even after being interrogated by Detective London, a relatively new police officer who is anxious to leave patrol and join the homicide unit. After excitedly escaping the police, the women go to a local restaurant and meet Sarah, Paris's younger sister. Sarah has not been involved with the previous robberies and is described as academically gifted and possibly college bound. At the restaurant, Sarah's romantic interest, Man, an employee of the restaurant, is introduced.

That night, while the older women are at a nightclub, Sarah's father rapes her. Upon discovering this, Paris fatally shoots him. She is arrested and taken to jail. During the next few scenes, Robinson juxtaposes Paris's experience in jail, for example, being assigned to a public defender, with Sarah's experience in the hospital, e.g., being counseled by a hospital social worker.

Paris's bail is set at $500,000 and the bailbondsman requires Sarah to provide $50,000 to secure the bond. Thus, the group, including Sarah, decides to rob various small businesses in order to raise the money required. Sarah takes Paris's gun. The group initiates Sarah by beating her up. At this point, the reader acknowledges Sarah's transformation from an innocent college-bound 17 year old to a street-wise tough woman who does not hesitate to fire a gun.

The group robs a record store, a street vendor, and a television store, but does not amass the $50,000 required for Paris's bailbond. They then decide to rob a crowded pool hall. During the robbery, which elicits gunfire from the pool hall patrons, Fawn, the shyest member of the group, is shot and then killed when she is struck by an oncoming car. Neicey is badly injured. Shay and Coco are extremely frightened by what has transpired and decide to separate from the group. Coco, in particular, says to Sarah that she "really hope[s] this is enough to get your sister our of jail, cause Coco ain't going to jail getting your sister out." At this point, Sarah and Man spend some time together. Paris remains in jail.

Sarah and Neicey remain determined to raise the bail money for Paris. Therefore, they decide to rob the restaurant where Man works. During the robbery, Sarah wears a disguise and Man does not recognize her. A scuffle ensues and Man stabs Sarah in the hand; she then shoots him. Later, after Sarah and Neicey steal money from Shay's parents' house (with Shay's help), Sarah finally has enough money for the bailbondsman to post bail for Paris.

---

6. Robinson's characterization of the screenplay is somewhat skewed. As discussed further below, the main characters initially commit random robberies without any articulated purpose. Furthermore, although a specific purpose later arises—raising money for bail, this hardly can be equated with the purpose, ascribed by Robinson, "to escape their life of poverty." In fact, at no juncture in the screenplay does the reader get the sense that the main characters' robberies will lift them from poverty. Moreover, the main characters' poverty, to the extent that it exists, is not developed as a main issue in Robinson's screenplay, further undercutting his characterization of his work.

The screenplay concludes with Paris "jumping" bail and leaving for St. Croix. Detective London, who had been investigating Paris's murder charge, sees Paris boarding the plane and allows her to escape. Sarah and Man get married. As he says "I do," he examines her wounded hand and realizes that Sarah was the person who shot him during the robbery of the restaurant. He marries her anyway and the screenplay ends.

### B. "Set it Off"

"Set it Off" was released by New Line in 1996 and starred, *inter alia*, Jada Pinkett Smith, Queen Latifah, Vivica Fox and Blair Underwood. The movie centers around four African American women who commit bank robberies in order to fulfill their "desire to move away," to fight back against "the unfairness of the system," and to combat alienation and poverty. *See* Def.'s Memo Summ.J. at 24. Defendants' description (amply supported by record evidence) of the creation of "Set it Off" follows.

In 1992, Bufford began thinking about writing a film about African American women committing crimes. He testified by affidavit that he was influenced by (1) movies representing tough women as protagonists, such as "La Femme Nikita" and "Thelma and Louise;" (2) movies with female protagonists, such as "Pretty Woman;" (3) Black genre films, such as "Boyz in the Hood" and "Menace II Society;" (4) the recent prevalence of female gangs; (5) the cinematic portrayal of the "romanticism in American culture regarding bank robbery;" and (6) his interest in including a *Pygmalion* element in the script. Consequently, Bufford prepared a story treatment of his ideas in 1992, entitled "No Tomorrow." [7] In late 1992 and early 1993, he worked with writer Janice Mabry to prepare a draft script based on the story. Mabry was to write 10–15 pages of the script at a time and send them to Bufford for his opinion. She completed an entire script in 1993.[8] Bufford was not satisfied with this draft, so he re-wrote it; this draft is dated October 15, 1993.

Bufford delivered this version of his screenplay to Echegoyen, who tried to interest New Line in the script. New Line rejected it. In approximately March 1994, Bufford secured the interest of Pollock in the film and Peak Productions then endeavored to obtain financing for the project. In late 1994, movie director F. Gary Gray agreed to direct the movie; it was his personal involvement that motivated New Line to purchase the option to the screenplay and agree to release the film.

After New Line acquired Bufford's script, Bufford, Gray, Pollock, Koules, and Echegoyen worked collaboratively to improve Bufford's screenplay. Many of these revisions further developed the char-

---

**7.** No date appears on this 14 page story treatment, and Robinson urges me to disregard it as a part of the summary judgment record. I decline to do so because Robinson has utterly failed to impeach this aspect of Bufford's attestation or otherwise to challenge the authenticity of the document.

**8.** Robinson attempts to undermine Bufford's claim of independent creation of the "Set it Off" screenplay by directing my attention to Bufford's deposition, in which he stated that he had nothing to do with anything typed in the document embodying the early Mabry–Bufford script. In relying on this testimony, however, Robinson ignores the remainder of Bufford's testimony in which he makes clear that Mabry was responsible for drafting the Mabry–Bufford script, under his supervision. Thus, his assertion that he had nothing to do with anything typed on the computer disk containing the Mabry–Bufford 1993 script, which was actually produced from Mabry, is not inconsistent with his testimony that he collaborated with Mabry on the screenplay.

In this same vein, Robinson's effort to wring a damaging admission from Bufford's litigation-related critique of Robinson's screenplay is unavailing. It is undisputed that by the time of his deposition in this case, Bufford had examined "Sister Sarah" and his willingness on deposition to express his view of its weaknesses does not rationally support an inference that he had examined it in 1993.

acters and broadened the plot.[9] By June 1995, New Line and the other parties were dissatisfied with Bufford's changes; thus, they retained Lanier to rework the script. Lanier made further changes to the script that ultimately became the movie "Set it Off."

"Set it Off" is a movie about four young African American women, Stony, Tisean, Cleo, and Frankie, living in Los Angeles who decide to commit bank robberies after a series of traumatic events place the women in dire circumstances. The women have apparently grown up together and at the commencement of the movie, Stony, Tisean, and Cleo work together cleaning office buildings at night. Frankie works as a bank teller.

The initial scenes establish each character's motivations to embark on the bank robbery path. The movie begins with a violent bank robbery, committed by men, at the bank where Frankie works. Because Frankie knew one of the suspects, she was aggressively interrogated by Detective Strode, a seemingly hard-nosed officer. She is consequently fired by the bank.

The next scene involves a high school graduation party for Stony's brother Stevie, with whom Stony has a close relationship. Ostensibly, Stevie has been accepted to UCLA, but he informs Stony he can not attend because he does not have enough money. To raise money so that Stevie can attend college, Stony agrees to have sex with Nate, a car salesman. Stevie, however, later reveals that he was not admitted to UCLA.

Stevie is later killed by the police who mistake him for a bank robber because he had his hair styled in the same way as the bank robber. Detective Strode arrives at the scene and observes Stevie get shot by the police. Stony is devastated and decides to participate in the bank robbery scheme as a means of escaping her present life situation and starting over.

The third primary character, Tisean, a shy, fragile woman with a two year old child, Jajuan, is also battling poor financial circumstances. She can not afford a babysitter and is forced to bring her baby to work. While unsupervised at the work site, Jajuan drinks cleaning fluid and is poisoned. Although the hospital is able to save him, it alerts the Department of Social Services, which removes Jajuan from Tisean's care. Because Tisean must show the Department that she can take care of her child financially, she also agrees to participate in the bank robbery scheme.

The final primary female character, Cleo, does not have a specific need that propels her to join the bank robbery scheme. She is the toughest and roughest member of the group and is involved in a lesbian relationship, which is explicitly depicted on screen. Cleo is the most aggressive member of the bank robbery gang and it is implied that she has a prior criminal history. She bears no illusions of ever escaping the life she currently leads.

With each participant's need for money established, preparations for the robbery begin. The gang engages in target practice, cases banks and learns how banks handle money. While casing a bank, Stony meets Keith, a well-to-do Harvard business graduate. The two become romantically involved and through her exposure to Keith's lifestyle, Stony's desire to build a new life emerges.

The first bank robbery is a success.[10] Detective Strode investigates but does not identify or apprehend the perpetrators.

---

9. Between March and April 1995, Echegoyen corresponded with Bufford, requesting that Bufford expand on certain characters, emphasize certain motivations, and add specific plot sequences to improve the screenplay. The differences between Bufford's initial draft and the movie version are substantial. These differences will be discussed below.

10. Tisean panics and abandons the first bank robbery. Despite Frankie's protests, Stony insists that the money be divided among all four women.

Although the women fight over the distribution of the money, they eventually make their peace and decide to rob another bank. This caper is more violent and riskier than the first. At the same time, Keith and Stony become closer. While Stony is at a fancy bankers ball with Keith,[11] the girls discover that their boss, Luther, has stolen their money. They track him down and Cleo threatens to kill him. Luther pulls a gun and as he is about to shoot Cleo, Tisean shoots and kills him. Cleo is then brought down to the station to participate in a line-up, but she is not identified by the woman who witnessed the shooting.

The gang, however, realizes that time is running out. The women decide to rob one final bank, the bank where Keith works, to obtain enough money to leave town. Afraid for Keith's safety, Stony calls him and asks him to meet her outside the building, with the intent of getting him out of harm's way. Ironically, while Stony phones him, Keith is being briefed by the police on the recent robberies and is viewing a bank surveillance tape. He recognizes Stony on the tape, but says nothing. The ensuing robbery is extremely violent; Detective Strode and the police respond immediately. Detective Strode almost persuades Tisean and Stony to drop their weapons and surrender, but at that moment a bank guard bursts in and shoots Tisean. Cleo then responds by repeatedly and wildly discharging her weapon. They then attempt to escape.

A dramatic and lengthy car chase follows, complete with extensive news coverage, provided by a helicopter-borne news team that is watched by many of the other characters in the movie. Tisean dies. Frankie, Cleo and Stony decide to separate. Strode approaches Frankie and pleads with her to surrender. He puts down his gun and shouts directions to the police to hold their fire. Frankie places a gun to Strode's head and asks him what the procedures are when you have a gun to your head. This is a reprise of Strode's actions in investigating the movie's first bank robbery, in which he badgered her with the same question before she was fired by the bank.

Frankie tries to run, in vain, and is shot and killed by the police. Cleo is also killed. Stony manages to board a bus for Mexico. Detective Strode sees her on the bus, or so the viewer thinks, but lets her go, possibly as a result of his guilt over Stevie's unjustified death at the hands of the police. The screenplay concludes with Stony calling Keith and thanking him; he knows she is safe.[12]

11. In a scene reminiscent of "Pretty Woman," Keith buys Stony a gorgeous evening gown for the ball.

12. The movie that was ultimately produced is quite different from the screenplay Bufford initially submitted. For example, in Bufford's first script Stony applied for a job at a post office and slept with the supervisor in order to get hired, Tisean was not shy and struggled with welfare benefit cuts and not child supervision, Stony's brother was addicted to cocaine and died in a botched bank robbery, and Stony's romantic interest figures out her life of crime and confronts her about it. More changes are evident in Bufford's last script of June 15, 1995, in which the screenplay opens with a bank robbery, Stony and her brother have a close relationship until he is killed by the police (although he is still not college-bound), Tisean is struggling with welfare benefits as well as supervision of her child, and Stony begins working in the post office. Bufford disagreed with New Line's decision to open the movie with the bank robbery and Frankie's employment termination; moreover, he disapproved of the depiction of the protective relationship between Stony and Stevie.

Defendants repeatedly distinguish the final movie version and Bufford's initial drafts, in an attempt to show that many of Robinson's claims of alleged similarity were not included in Bufford's initial draft of the screenplay. Thus, as Bufford is the person whom Robinson contends saw his screenplay and copied it, and Bufford's version did not include many of the components of which Robinson is complaining, there can be no copyright infringement. Because as a matter of law, defendants' movie, which Robinson complains infringes his copyright, is not substantially similar to "Sister Sarah," regardless of who drafted which segment, I need not pause over this issue.

## II. SUMMARY JUDGMENT STANDARDS

Pursuant to Fed.R.Civ.P. 56(c), summary judgment is appropriate "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). In considering a motion for summary judgment, the facts, as well as the inferences to be drawn therefrom, must be viewed in the light most favorable to the nonmovant. *Matsushita Elec. Indust. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587–88, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986). A party moving for summary judgment is entitled to a grant of summary judgment only if no issues of material fact remain for the trier of fact to determine at trial. *Id.* at 587, 106 S.Ct. 1348. A fact is material for purposes of summary judgment, if when applied to the substantive law, it affects the outcome of the litigation. *Anderson*, 477 U.S. at 248, 106 S.Ct. 2505. "Summary judgment is not appropriate when there is an issue of fact for a jury to determine at trial, which is the case when there is sufficient evidence favoring the non-moving party upon which a jury can return a verdict for that party." *Shealy v. Winston*, 929 F.2d 1009, 1012 (4th Cir. 1991).

A party opposing a properly supported motion for summary judgment bears the burden of establishing the existence of a genuine issue of material fact. *Anderson*, 477 U.S. at 248–49, 106 S.Ct. 2505. The nonmovant "cannot create a genuine issue of fact through mere speculation or the building of one inference upon another." *Beale v. Hardy*, 769 F.2d 213, 214 (4th Cir.1985). *See O'Connor v. Consolidated Coin Caterers Corp.*, 56 F.3d 542, 545 (4th Cir.1995), *rev'd on other grounds*, 517 U.S. 308, 116 S.Ct. 1307, 134 L.Ed.2d 433 (1996). "When a motion for summary judgment is made and supported as provided in [Rule 56], an adverse party may not rest upon the mere allegations or denials of the adverse party's pleading, but the adverse party's response, by affidavits or as otherwise provided in [Rule 56] must set forth specific facts showing that there is a genuine issue for trial." Fed.R.Civ.P. 56(e). *See Celotex Corp. v. Catrett*, 477 U.S. 317, 324, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986); *Anderson*, 477 U.S. at 252, 106 S.Ct. 2505; *Shealy*, 929 F.2d at 1012.

## III. ANALYSIS

### A. Copyright Infringement

"Copyright law protects an author's expression; facts and ideas within a work are not protected." *Shaw v. Lindheim*, 919 F.2d 1353, 1356 (9th Cir.1990); *Williams v. Crichton*, 84 F.3d 581, 587 (2d Cir.1996) ("[C]opyright does not protect an idea, but only the expression of an idea.") (internal quotation omitted). Drawing the line, however, between an unprotected idea and a protected form of expression is often a difficult task. Judge Learned Hand's oft-quoted passage from *Nichols v. Universal Pictures Corp.*, 45 F.2d 119, 121 (2d Cir.1930), *cert. denied*, 282 U.S. 902, 51 S.Ct. 216, 75 L.Ed. 795 (1931), remains a particularly instructive guide:

> Upon any work, ... a great number of patterns of increasing generality will fit equally well, as more and more of the incident is left out. The last may perhaps be no more than the most general statement of what the [work] is about, ... but there is a point in this series of abstractions where they are no longer protected, since otherwise the [author] could prevent the use of his 'ideas' to which, apart from their expression, his property is never extended.

Thus, even if Robinson's screenplay and defendants' movie embody the same idea—African American women committing crimes—unless the particular expression of that idea has been copied, there can be no copyright infringement.

To succeed on his copyright infringement claim, Robinson must demonstrate first that he "owned the copyright to the work that was allegedly copied, and second, that the defendant copied protected elements of that work." *Towler v. Sayles,* 76 F.3d 579, 581 (4th Cir.1996) (citing *Feist Publications, Inc. v. Rural Tel. Serv.,* 499 U.S. 340, 361, 111 S.Ct. 1282, 113 L.Ed.2d 358 (1991)); *Dawson v. Hinshaw Music, Inc.,* 905 F.2d 731, 732 (4th Cir.1990) ("[P]laintiff[ ] can establish a prima facie case of infringement by showing possession of a valid copyright, the defendant's access to the plaintiff's work, and substantial similarity between plaintiff's and defendant's works."). Defendants have conceded, for purposes of the pending motion, that Robinson possessed a valid copyright in his "Sister Sarah" screenplay; accordingly, Robinson must only prove the second element, that defendants copied protectable elements of his screenplay.

Direct evidence of copying is rare; therefore, Robinson can establish that defendants copied his work by showing (1) defendants had access to his screenplay and (2) a substantial similarity between the two works. *See Towler,* 76 F.3d at 581; *Gaste v. Kaiserman,* 863 F.2d 1061, 1066 (2d Cir.1988) ("Because copiers are rarely caught red-handed, copying has traditionally been proven circumstantially by proof of access and substantial similarity"); *Zervitz v. Hollywood Pictures, Inc.,* 989 F.Supp. 727, 729 (D.Md.1995) ("Plaintiff may prove copying circumstantially by showing that (1) defendants had access to Plaintiff's work; and (2) defendants' work is substantially similar to plaintiff's work."). I turn, then, to an evaluation of the record evidence to determine whether

Robinson can survive summary judgment as to these two critical elements of his claims.

### 1. Access

To demonstrate access, Robinson must establish that defendants "had an opportunity to view or to copy [his] work." *Towler,* 76 F.3d at 582. A mere possibility, speculation, or conjecture about access does not satisfy this standard; rather, Robinson must demonstrate that it is "reasonably possible that the paths of the infringer and the infringed work crossed." *Id.* See also *Takeall v. Pepsico, Inc.,* 809 F.Supp. 19, 21 (D.Md.1992) ("What must be shown is more than a bare possibility of access (which would amount to no more than conjecture) . . . ."), *aff'd without op.,* 14 F.3d 596 (4th Cir.1993), *cert. denied,* 512 U.S. 1236, 114 S.Ct. 2742, 129 L.Ed.2d 861 (1994).

■ There are various ways through which Robinson can seek to establish defendants' access to his screenplay. That is, "access may be inferred by (1) evidence of review by a member of a work unit that includes one of the defendant-copiers; (2) evidence of possession by a third party who was an intermediary in a channel of communication between a plaintiff and one of the defendant-copiers; (3) evidence that the work was widely disseminated; and (4) evidence that the two works at issue are 'strikingly similar.' " [13] *Zervitz,* 989 F.Supp. at 729 (citing 4 *Nimmer on Copyright* § 13.02[A], 13–15–21).[14]

■ As set forth above, one way that Robinson might generate a genuine dispute of material fact as to access is

---

**13.** " 'Striking similarity' refers to the situation where two works 'are so nearly identical that it is virtually inconceivable' that the second work was independently created." *Zervitz,* 989 F.Supp. at 729, n. 2 (citing *Gaste,* 863 F.2d at 1068). A plaintiff does not need to prove access when the two works are so strikingly similar so as to "preclude the possibility that the defendant independently arrived at the same result." 4 *Nimmer on Copyright,* 13.02[A], 13–21–22. Robinson does not

contend that his screenplay is so strikingly similar to "Set it Off" that he is relieved of his burden to demonstrate access.

**14.** There is no evidence in the record that "Sister Sarah" was widely disseminated, nor has Robinson argued such. Therefore, I will focus on the other possible ways to infer access.

through the third party intermediary doctrine. *See Towler,* 76 F.3d at 583. "An intermediary will fall within this category, for example, if she supervises or works in the same department as the infringer or contributes creative ideas to him." *Id; Meta–Film Assoc. v. MCA, Inc.,* 586 F.Supp. 1346, 1355 (C.D.Cal.1984) (noting that an intermediary is either "the person who had viewed plaintiff's work and was therefore in a position to transmit it to the copier, . . . a supervisor with responsibility for the defendant's project, was part of the same work unit as the copier, or contributed creative ideas or material to the defendant's work").

■ A genuine dispute of fact as to the "reasonable possibility" of access can also be established by the corporate receipt doctrine, whereby "the fact that one employee of the corporation has possession of plaintiff's work should warrant a finding that another employee (who composed defendant's work) had access to plaintiff's work, where by reason of the physical propinquity between the employees the latter has the opportunity to view the work in the possession of the former." *Moore v. Columbia Pictures, Inc.,* 972 F.2d 939, 942 (8th Cir.1992) (citing 4 *Nimmer on Copyright* § 13.02[A] ). Because the "corporate receipt doctrine" only "applies where there is a 'relationship linking the intermediary and the alleged copier,'" the mere fact that a work is mailed to a corporation which happens to be a defendant is not sufficient by itself to generate a dispute of fact under the corporate receipt doctrine, as the doctrine is predicated on the "physical propinquity" between the employees that creates a reasonable opportunity to view the work. *Moore,* 972 F.2d at 941 (*citing Meta–Film,* 586 F.Supp. at 1357). *See also Takeall,* 809 F.Supp. at 21–22 (granting summary judgment for defendant because receipt of plaintiff's work by defendant Pepsi's subsidiary and its regional office was insuffi-

cient to establish access); *Eaton,* 972 F.Supp. at 1019–23 (holding that no reasonable possibility of access existed despite plaintiff's submission of her work to defendant corporation NBC); *Meta–Film,* 586 F.Supp. at 1358 (rejecting the contention that " 'bare corporate receipt' is sufficient as a matter of law to preclude a finding of non-access"). Thus, for example, if the defendant corporation can prove that "decisionmaking and creative personnel are insulated from unsolicited submissions by established procedures whereby clerical personnel automatically return such submissions to the senders before being viewed by others in the company," access will not reasonably be inferred, despite corporate receipt. 4 *Nimmer on Copyright,* 13.02[A], 13–18.

■ "The line between speculation and conjecture, on the one hand, and circumstantial evidence sufficient to support a verdict on the other, can be exceedingly fine." *Takeall,* 809 F.Supp. at 23. Viewing the evidence in the light most favorable to Robinson here, I am persuaded that Robinson has failed to establish a reasonable possibility of access.

Robinson's sole evidence of access is his submission of "Sister Sarah" to the New Line Acquisitions Department, a completely separate department from the Productions Department, where "Set it Off" was produced.[15] In August 1993, Robinson submitted his script to Labowitz, of the New Line Acquisitions Department, pursuant to an unsolicited "cold" phone call. Labowitz has testified that the general practice in her department was to log the script into the computer database, assign the script to a reader, and make an assessment of the script, and that this procedure was followed in this case. Labowitz returned the script to Grubb in September 1993. She testified by affidavit that she has no recollection of photocopying Robin-

---

**15.** The Acquisitions Department is located on the fourth floor of the New Line building in Los Angeles, while the Productions Department is on the second floor.

son's script, nor can she think of why a copy would have been made.

Robinson contends, however, that a reasonable possibility of access is established through Labowitz's and Echegoyen's joint attendance at weekly meetings for New Line executives. Michael De Luca, the head of the Productions Department, testified, however, that the purpose of these weekly meetings was to update other departments as to what was currently being produced in each department, or on what had recently been produced. Echegoyen testified that she attended these meetings mostly as an observer, unless she had a project that she was working on. Labowitz testified that these meetings served to advise the executives as to the status of active projects in each department. Thus, there is no support for the speculation that unsolicited material delivered to the Acquisitions Department was the subject of any discussion at one of the weekly meetings.

Nonetheless, from this evidence, Robinson asserts that he is entitled to have the jury draw the following conclusion: that during one of the weekly meetings for New Line executives, Labowitz transmitted the "Sister Sarah" screenplay to Echegoyen. Consequently, because Echegoyen was under a mandate to produce black genre films, and because she and Bufford were close personal and professional friends, Robinson contends that his screenplay must have been transmitted to Bufford. This speculative scenario is wholly unsubstantiated by admissible evidence. Moreover, that New Line initially rejected Bufford's screenplay seriously undercuts Robinson's argument. Had New Line Productions possessed Robinson's script and then passed it along to Bufford so that he could embellish it, it seems hardly likely that New Line would then reject the script for almost a year.

Manifestly, Robinson's evidence of access does not satisfy the corporate receipt doctrine. Corporate receipt is sufficient to infer access if the two involved employees (the receiver and the alleged copier) are in sufficiently close "physical propinquity" so that one employee has an opportunity to view the work of the plaintiff delivered to the other employee. *See Moore,* 972 F.2d at 942; 4 *Nimmer on Copyright,* 13.02, 13–17. Yet, here, Labowitz and Echegoyen did not work in the same department, or even on the same floor at New Line. That copy machines exist on each floor is insufficient to establish that Labowitz reasonably could be inferred to have made a copy and given it to Echegoyen. Moreover, Labowitz testified, without contradiction, that she never brought a script to the weekly meetings described above.

Furthermore, Robinson's contention that the third party intermediary doctrine applies is without merit. Labowitz is not a third party intermediary. She was not a supervisor on the "Set it Off" project, she did not work in the same department as Bufford, the alleged copier, nor did she contribute any creative ideas or input to the "Set it Off" story.[16] *See e.g., Towler,* 76 F.3d at 583 (recognizing that "the dealings between the intermediary and the alleged copier must involve some overlap in subject matter to permit an inference of access," and affirming the grant of judgment as a matter of law for defendant because the plaintiff failed to demonstrate access); *Eaton v. National Broadcasting Co.,* 972 F.Supp. 1019, 1021 (E.D.Va.1997) (even though plaintiff submitted her copyrighted work to an employee of the defendant corporation, she failed to demonstrate a reasonable possibility of access), *aff'd without op.,* 145 F.3d 1324 (4th Cir.1998).

To be sure, Echegoyen would qualify as an intermediary had Robinson's screenplay been submitted directly to her; she did

**16.** Bufford is not a New Line employee. In the summer of 1993, Bufford was working on "House Party III" for New Line. His work on "Set it Off," however, was conducted apart from any of his previous New Line assign-ments. De Luca testified in deposition that New Line "didn't hire [Bufford] as a writer. He came with the screenplay. We just kept him on. It was his screenplay." De Luca Dep. at 93.

work collaboratively with Bufford on the script and contributed creative ideas to him. There is no evidence in the record, however, that supports Robinson's speculative theory that his screenplay was transmitted from Labowitz to Echegoyen.

In an argument that melds the distinct "corporate receipt" and "third party intermediary" doctrines, Robinson asserts that New Line was the intermediary between Robinson and Bufford. Although this contention might have some surface appeal, it does not withstand scrutiny. "[P]roof of access is only probative of copying to the extent that the alleged copier had access to the protected work. Thus it is access by the creators of the allegedly infringing work that must be shown." *Eaton*, 972 F.Supp. at 1023, n. 7 (rejecting plaintiff's argument that she was only required to show that defendant NBC, in general, and not the actual creators of the allegedly infringing television series, had access to plaintiff's copyrighted material). Accordingly, it is not sufficient for Robinson to claim that New Line, in general, had access to Robinson's script; he must show that the creators of "Set it Off," attained access to his script.

Echegoyen, Bufford and De Luca all deny receiving a copy of "Sister Sarah" from Labowitz or the Acquisitions Department and Labowitz denied delivering a copy to any of them. Thus, a conclusion that there was a reasonable possibility of access based on a transfer of the screenplay from Labowitz to the defendants would necessarily "be based only on speculation and conjecture, grounded on a total disbelief of all of the deposition [and affidavit] testimony from those with personal knowledge of the facts." *Takeall*, 809

F.Supp. at 23. "It is well-settled that, on summary judgment, absent specific facts discrediting testimony from a witness associated with the defendant, and absent a direct conflict in the testimony, the plaintiff is not entitled to have the defendant's evidence positively disbelieved." *Id.* at 22.[17] Accordingly, as a matter of law, the record demonstrates no reasonable possibility of access on the part of defendants, and summary judgment is appropriate on this ground alone.

### 2. Substantial Similarity

Even if access could be inferred, to withstand defendants' motion for summary judgment, Robinson must still establish that "Sister Sarah" is substantially similar to "Set it Off." *See Towler*, 76 F.3d at 583. Substantial similarity involves a two prong analysis. *See id.* "First, a plaintiff must show—typically with the aid of expert testimony—that the works in question are extrinsically similar because they contain substantially similar ideas that are subject to copyright protection." *Towler*, 76 F.3d at 583. This test requires the court to analyze both works and compare the plot, theme, characters, setting, mood, pace and dialogue for substantial similarities. *See id.*

"Second, a plaintiff must satisfy the subjective, or intrinsic, portion of the test by showing substantial similarity in how those ideas are expressed." *Id.* at 583–84. The intrinsic test requires a comparison of the "total concept and feel" of the two works, through the eyes of the "intended audience of the plaintiff's work," in this case, the lay observer or moviegoer. *Dawson*, 905 F.2d at 736.

**17.** Robinson argues that Echegoyen and Bufford contradict each other as to who was the original creator of the "Set it Off" idea. Bufford's testimony is set forth above. Echegoyen testified that after the release of "Thelma and Louise" she mentioned to Bufford the idea of doing a black "Thelma and Louise" movie, that she "pitched the arena" to Bufford. Bufford agreed and thought that this was a great idea. Echegoyen recalls that

Bufford asked her to write the treatment for the idea, which she never did. Bufford then came to her with a full script. This dispute, to the extent that one exists, does not preclude a finding that Robinson has not demonstrated a reasonable possibility of access, as he has not established, with any evidentiary support, that Labowitz, or anyone in the Acquisitions Department transmitted the script to the Productions Department.

Consequently, "a court may determine non-infringement as a matter of law on a motion for summary judgment, either because the similarity between the two works concerns only 'noncopyrightable elements of the plaintiff's work,' or because no reasonable jury, properly instructed, could find that the two works are substantially similar." *Eaton*, 972 F.Supp. at 1023 (citing *Warner Bros., Inc. v. American Broadcasting Cos.*, 720 F.2d 231, 240 (2d Cir.1983)); *Williams*, 84 F.3d at 587 (internal citation omitted) (noting that summary judgment is appropriately granted if "the similarity concerns only noncopyrightable elements of plaintiff's work or if no reasonable trier of fact could find the works substantially similar").[18] After scrutinizing Robinson's screenplay, drafts of defendants' screenplay, and viewing "Set it Off," I conclude that a reasonable juror could not find that the two works are substantially similar and thus summary judgment is appropriate.

a. Extrinsic Similarity

1. Plot

 The plot of "Sister Sarah" and "Set it Off" are similar only to the extent that both works describe a story about African American women committing crimes. I will address Robinson's main allegations of substantial similarity in both plots.[19] Robinson's first basis of similarity is that both works depict African American women committing crimes. This idea can not be copyrighted, therefore, it is insufficient as a matter of law to establish substantial similarity.[20] *See e.g., Beal v. Paramount Pictures*, 20 F.3d 454, 460 (11th Cir.1994) (noting that even though both works "featured a romantic triangle, the mere existence of this device is unoriginal and uncopyrightable"), *cert. denied*, 513 U.S. 1062, 115 S.Ct. 675, 130 L.Ed.2d 607 (1994). In addition, the crimes themselves are depicted differently. For example, the robberies committed are extremely different. In "Sister Sarah," the women rob random small businesses, without any prior preparation, and without any substantial police chase. In "Set it Off," the entire movie is focused on specific bank robberies that have been thoroughly prepared for, and draw extensive police attention.[21] Furthermore, although both works open with a robbery, in "Sister Sarah," the robbery is committed by the five main characters, whereas in "Set it Off," the bank robbery that opens the movie is committed by peripheral male characters and

---

**18.** Recently, the Ninth Circuit has held that only extrinsic similarity is relevant for summary judgment purposes and that summary judgment can not be granted if an issue of triable fact exists based on extrinsic similarity. *See Shaw*, 919 F.2d at 1359; *Kouf v. Walt Disney Pictures*, 16 F.3d 1042, 1045 (9th Cir. 1994). I, of course, am guided by the Fourth Circuit's reasoning in *Towler* and *Dawson*.

**19.** Robinson alleges that both works "start with an initial robbery, the introduction to the male romantic interest, the lead females wanting a better life, the lead females talking to their romantic interests about going away to a better life, the sibling event, the group of women deciding to do whatever they gotta do, the detectives going by the book without regard to the unfairness, the death of the shy character during the robbery, the escape, and the reconnection with the male romantic interest." *See* Pl.'s Memo in Opp'n to Summ.J. at 28–29. At this level of generality, any creative work that included these broad ele-

ments would infringe plaintiff's copyright. Surely, this does not comport with our copyright laws.

**20.** Not only can the idea of African American women committing crimes not be copyrighted, but additionally, Robinson's screenplay is not even about such an idea. Robinson's screenplay involves five African American women and one white woman who commit crimes. Robinson does not explain the motivation or purpose of using this interracial group to convey his story. It is somewhat inaccurate, therefore, to characterize both scripts as embodying the idea of African American women committing crimes.

**21.** Along the same vein, in "Sister Sarah," all of the characters escape detection from the police. This is grossly distinguishable from "Set it Off," in which the police kill three of the four main characters during the final robbery scene.

is used as a device to establish Frankie's motivations to commit crimes. Therefore, the similar event, upon closer scrutiny, is quite different.

Nor does Robinson's contention that both works include a "sibling event" support his infringement claim. In "Sister Sarah," this "sibling event" occurs when Sarah is raped by her father, who is then shot by Paris, who is in turn, incarcerated. This bears no resemblance to Stony's brother, Stevie, being shot by the police who mistake him for a bank robber. Furthermore, the sibling event does not bear the same significance in each screenplay. In "Sister Sarah," the gang has been committing crimes recklessly prior to Sarah's rape and Paris's incarceration. It is only Sarah that joins the gang after this event. In "Set it Off," none of the women have been robbing banks before the events in the movie; it is only after each faces a traumatic event (or her distinct motivation for participating in the robbery scheme is played out) that they decide to rob banks.

Critical differences also exist in the "romantic interest" that Robinson claims is a substantially similar plot element. Sarah and Man's relationship is superficial and remains undeveloped during the screenplay, except for a few short scenes. Demonstrably, Man is not from a different socio-economic class than Sarah and does not expose her to a different lifestyle. On the other hand, the Stony/Keith relationship is a pivotal part of "Set it Off" and is the plot device that gives substance to Stony's emergent desire to start a new life.

Next, Robinson attempts to craft a similarity out of the allegation that both works involve a reconnection of the love interests at the end of the movie. This effort fails, however, as the endings are quite distinct. Sarah and Man get married at the end of

"Sister Sarah." Stony phones Keith from Mexico to let him know she is safe, but there is no insinuation that they will ever be together again.

Relatedly, there is nothing similar beyond the general idea of robbing the place of employment of the leading character's love interest. In "Sister Sarah," Sarah expresses no hesitation in robbing Man's restaurant and even shoots him during the robbery. The gang also burglarizes Shay's parents' home. In "Set it Off," Stony initially resists her friends' suggestion to rob Keith's bank and specifically asks him to meet her somewhere outside the bank, so that he will not be harmed during the robbery.

Finally, many of Robinson's allegations of similarity are scenes a faire, "sequences of events that 'necessarily result from the choice of a setting or situation' " that are not copyrightable. *Williams*, 84 F.3d at 587 (citing *Walker v. Time Life Films*, 784 F.2d 44, 50 (2d Cir.1986)).[22] Accordingly, that both works contain security cameras, violence, a police man doing his duty, and the countdown of time during a robbery, is not probative of substantial similarity as these are all consequences of the stock scene of robbery, choices that flow from the uncopyrightable idea to do a movie about robberies.

Because the actual plot components of each work are different, and to the extent that surface similarities exist, they exist in only noncopyrightable elements, the plots of "Sister Sarah" and "Set it Off" can not reasonably be found to be substantially similar.[23] *See e.g.*, *Kouf*, 16 F.3d at 1043(no substantial similarity between plot of "Honey I Shrunk the Kids" and a screenplay adventure story in which a genius invents a formula that can shrink people); *Litchfield v. Spielberg*, 736 F.2d

---

**22.** For example, "[e]lements such as drunks, prostitutes, vermin and derelict cars would appear in any realistic work about ... policemen in the South Bronx, and thus are unprotectible scenes a faire." *Williams*, 84 F.3d at 588.

**23.** Robinson's contentions regarding the sequence of both works is essentially identical to his allegations regarding plot. Therefore, it is not necessary to separately discuss the works' sequence.

1352, 1354 (9th Cir.1984) (no substantial similarity between the motion picture "E.T." and plaintiff's play about aliens with extraterrestrial powers who are stranded on earth), *cert. denied,* 470 U.S. 1052, 105 S.Ct. 1753, 84 L.Ed.2d 817 (1985); *Williams,* 84 F.3d at 583, 589 (no substantial similarity between the movie "Jurassic Park" and plaintiff's novel about a trip children take to a dinosaur zoo even though in both works, "characters escape deadly, pack-hunting dinosaurs ... when another dinosaur intervenes"); *Beal,* 20 F.3d at 460 (holding that the movie "Coming to America" was not substantially similar to a novel that also depicted a foreign prince who came to the United States and met the woman he was going to marry).

## 2. Theme

■ Robinson identifies the theme of "Sister Sarah" as "aris[ing] out of the story, and is the appreciation of how desperate situations can lead to desperate actions." Pl.'s Memo in Opp'n Summ.J. at 30. Robinson's expert, Dr. Dawn Cooper Barnes,[24] testified that a major theme in "Sister Sarah" is "extreme sympathy for a group of underdog characters who are engaged in crime in the face of a fairly hopeless life." To the contrary, this theme can hardly be said to be conveyed by "Sister Sarah." The women, initially, are committing crimes for *no* apparent reason; then they do so for the sole purpose of *bailing out* Paris, not for any larger, more noble goal of escaping poverty. Moreover, there is nothing about the characters or sequence of events that conveys "a fairly hopeless life." In fact, despite the admittedly traumatic events that befall Sarah and Paris, hopelessness is not at the heart of this screenplay. Neicey has a child that appears well taken care of, Shay's parents drive a Volvo and possess enough money to have $10,000 in their house, and all of the women, with the exception of Fawn,

participate in the crimes without legal (or any other) consequence to themselves.

In sharp contrast, a main theme of "Set it Off" is each character's "need for money, the desire to move away, the unfairness of the system, and the larger effect the system has on the individual." Def.'s Memo Summ.J. at 24. This theme is conveyed in almost every scene in the movie, through the dialogue between the gang members, the events that occur, and in Stony's relationship with Keith. Whatever similarities do exist between the themes of both works, they are expressed very differently. *See Denker v. Uhry,* 820 F.Supp. 722, 731 (S.D.N.Y.1992) (recognizing that although racism was a major theme of both "Driving Miss Daisy" and plaintiff's novel, summary judgment was proper because "the expression of this theme differs"), *aff'd,* 996 F.2d 301 (2d Cir.1993). *See also Williams,* 84 F.3d at 589 ("Any similarity in the theme of the parties' works relates to the unprotectible idea of a dinosaur zoo. Once one goes beyond this level of abstraction, the similarity in themes disappears."). Accordingly, as a matter of law, the themes in both works are not substantially similar, the bare opinion of Robinson's expert to the contrary notwithstanding.

## 3. Characters

■ "The protection afforded characters depicted in a creative work is limited." *Denker,* 820 F.Supp. at 734; *Smith v. Weinstein,* 578 F.Supp. 1297, 1303 (S.D.N.Y.1984) ("No character infringement can succeed unless plaintiff's original conception sufficiently developed the character, and defendants have copied this development and not merely the broader outlines."). A reasonable trier of fact *could not find* that the characters in "Set it Off" and "Sister Sarah" are substantially similar.

"The less developed the characters, the less they can be copyrighted; that is the penalty an author must bear for marking

24. Barnes has a Ph.D. in Cinema from the University of Maryland. She is currently an Associate Professor of Performing Arts at Howard Community College.

them too indistinctively." *Nichols*, 45 F.2d at 121. Robinson's characters in "Sister Sarah" meet this fate, however, as they are not sufficiently developed—nothing beyond broad character outlines—to receive copyright protection. For example, Barnes testified that Neicey and Cleo are substantially similar because they are both "rough[ ] and foul-mouthed" and tough. This bare character outline of Neicey is insufficient to warrant copyright protection. One can not copyright a "rough" female character.

The same is true for the comparison between Coco and Frankie, who are described by Barnes as similar beautiful African American women. Physical characteristics aside, Coco possesses none of Frankie's emotional depth, does not encounter a particularly tragic event that propels her into a life of crime, and does not die a tragic death. In fact, nothing happens specifically to Coco in Robinson's screenplay. Thus, the *de minimis* comparisons based on physical beauty are insufficient to establish substantial similarity. *See also Eaton*, 972 F.Supp. at 1028 (noting that "basic character types are not copyrightable" and "only a uniquely developed character with some degree of novel-

ty is copyrightable") (internal quotation and citation omitted).[25]

Robinson's comparison of Fawn and Tisean also falls short of demonstrating substantial similarity. Although both characters are "described as quiet and timid," and both characters die in a robbery, this sketchy outline description of Fawn does not earn copyright protection, as Robinson can not be entitled to "lock up" the idea of a "shy woman." Most significantly, Fawn does not have a child, which is Tisean's major motivation to participate in the robberies. *Cf. Williams*, 84 F.3d at 589 (recognizing that "when one looks beyond the superficial similarities [between the characters], many differences emerge, including the motivations for the characters' trip to the dinosaur parks, the skills and credentials of the characters and their interpersonal relationship").[26]

Finally, Robinson contends that Stony is substantially similar to a *combination* of Paris and Sarah. Barnes states that "both Paris and Stony are protective, older sister types … both are concerned about the education of their younger sibling … both have a male love interest." Pl.'s Ex. 5 at 4. These bare similarities do not establish substantial similarity, nor do they take into consideration Stony's well-developed rela-

25. In *Eaton*, the court rejected the claim that the characters were substantially similar even though both works had main characters with similar jobs and were the same gender, both series had a cute and precocious young child, and both had an overweight, humorous garage employee as a secondary character. *Eaton*, 972 F.Supp. at 1029. "Basic human traits that certain characters share, including age, sex, and occupation, 'are too general or too common to deserve copyright protection.'" *Id.* (citing *Sinicola v. Warner Bros.*, 948 F.Supp. 1176, 1187 (E.D.N.Y.1996)).

26. Robinson also compares Detective London in "Sister Sarah" to Detective Strode in "Set it Off." Barnes states that the two detectives are substantially similar because "both characters are detectives; both become personally involved in the life of the central character, both allow the central character to escape without apprehending them. Both … are Caucasian." Barnes' Aff. ¶ 5. To the contrary, the two detectives are not substantially

similar. True, both men are Caucasian detectives who are involved in investigating crimes in both works. The similarities, which are uncopyrightable character outlines, end there, however. *Cf. Denker*, 820 F.Supp. at 735 (holding that characters who were "both black, [were] hired to render assistance to an elderly Jewish person, develop a friendship with their employer … are broad, unprotectible character outlines"). Detective London is a fairly inexperienced officer who investigates his first homicide during the screenplay. He does not reach out to the characters and attempt to persuade them to surrender (this could not occur, in any event, as the women are never chased or investigated in person by the police for the robberies). Detective Strode, on the other hand, appears to be a commanding officer who has many officers under his charge. He immediately shows compassion for Stony, upon the death of her brother, and pleads with the gang to surrender to avoid further harm.

tionship with Keith that reveals her strong motivation to build a new life. *Cf. Denker,* 820 F.Supp. at 734–35 (holding that although both main characters were "elderly, Jewish and strong-willed, [and] both mistrust[ed] their black helpers ...," this did not establish substantial similarity). In addition, Robinson notes that both Stony and Sarah are forced to have sex with a man. This assertion mischaracterizes Stony's choice, albeit a constrained one, to have sex with Nate, the car salesman. This choice can not be compared to the violent rape of Sarah by her father. Therefore, as a matter of law, I reject this attempt to combine discrete characters in a "two for one" gambit. *But see Universal City Studios, Inc. v. Film Ventures, Int'l, Inc.,* 543 F.Supp. 1134, 1137–38 (C.D.Cal. 1982) (finding substantial similarity between one character in defendants' work and a combination of two characters in plaintiffs' work, "Jaws").

### 4. Setting

■■■ The settings in "Sister Sarah" and "Set it Off" are not substantially similar. Robinson's screenplay is set in Baltimore, and defendants' movie takes place in Los Angeles. Barnes testifies that both settings are substantially similar in that they are both set in an "urban African American community where people are poor and often unemployed within a major American city." *See* Pl's Ex. 5 at 6. This is insufficient to satisfy the substantial similarity standard.[27] *See Eaton,* 972 F.Supp. at 1029 (finding no substantial similarity in the setting of automotive repair garages).

Furthermore, Robinson's contentions that in "both works, the main characters meet and discuss recent escapades in a local, neighborhood style restaurant ... and the love scenes between the parallel characters [in both works] occur at the [ ] male love interest's apartment" fail to rec-

ognize that these are unoriginal settings that flow from the general ideas embodied in each scene. *See Williams,* 84 F.3d at 589 ("While both the Dinosaur World books and the Jurassic Park works share a setting of a dinosaur zoo or adventure park, with electrified fences, automated toys, dinosaur workers, and uniformed workers, these settings are classic scenes a faire that flow from the uncopyrightable concept of a dinosaur zoo"); *Beal,* 20 F.3d at 463 ("[T]he presence of hotels, dining in a restaurant near a window, festivities at a palace, and parties at a private home are not copyrightable elements" of the setting). Finally, aside from the general similarity in both works' urban environments, the particular settings in each screenplay are quite different. For example, in "Sister Sarah," many events take place at a pool hall, a local restaurant, and in small businesses. In "Set it Off," many of the scenes take lace at the womens' place of employment, in banks, and in Keith's fancy apartment.

### 5. Dialogue

■■■ Robinson acknowledges that there are no passages of dialogue in "Set it Off" that are copied verbatim from "Sister Sarah." Nonetheless, Barnes testifies that "the resemblance [in dialogue] grows out of the parallel characters expressing themselves in substantially similar settings and situations." As I have concluded that neither the characters, nor the setting in the two works are substantially similar, this assertion lacks probative value.

Furthermore, in "Sister Sarah" the dialogue consists primarily of profanity, lewd sexual comments, and short passages of banter between the women. Conversely, in "Set it Off," the characters do not use excessive profanity and engage in lengthy conversations about unemployment, the future, and friendship.

---

27. Robinson's additional contentions, that in both works, the main characters live in houses and not housing projects, and that the groups count their money in a character's house, and that both have steel doors play quite insubstantial parts in both works and are insufficient to establish substantial similarity.

Robinson also claims that (1) both works have a character counting time in a robbery and (2) both works have characters commenting on an ugly baby, thereby indicating substantial similarity. These alleged similarities are insufficient to demonstrate substantial similarity. The first contention, that of counting time, is simply a stock scene device that stems from the fact that both movies are about robberies. *See supra* at 592–593. Moreover, although both works contain a reference to an "ugly baby," the similarity ends there. In "Sister Sarah," "funny looking baby" is mentioned in the background, after the gang encounters someone who is disliked by the group and who has a child. In "Set it Off," Cleo, while cleaning the office building with her friends, looks at a picture of a white middle class family. In the discussion about the differences between the family and herself, Cleo states that white people are having ugly babies. The two dialogues are included for completely different purposes and express different themes. Therefore, the fact that both works involve a similar comment does not further Robinson's claim of substantial similarity.

### 6. Mood/Pace

■ As with all of the other extrinsic elements, the mood of each work differs from the other. Despite Barnes's characterization of the mood of both works as "serious with lighthearted moments and an optimistic ending," this is hardly a copyrightable idea and does not accurately capture the mood of "Set it Off." In "Set it Off," the mood at the end is hardly optimistic, after Frankie, Tisean, and Cleo are all tragically and unnecessarily killed. Stony's escape is a positive event, yet is one that hardly erases the pain the viewer is expected to experience in the final ten minutes of the movie, as she watches each character die tragically. Conversely, the end of "Sister Sarah" is absolutely lighth-

earted. Fawn has died, but this occurs much earlier in the screenplay. After obtaining the money required, Paris is released from jail and escapes, and Sarah marries Man.[28] These happy events convey a lighthearted mood that is entirely absent from the conclusion of "Set it Off."

Similarly, the pace of the two works is not substantially similar. While both employ robbery scenes that include some action sequences, these similarities are unprotectible scenes a faire. Moreover, "Set it Off" concludes with a lengthy and fast-paced chase scene, consisting of almost 10 minutes of the movie. "Sister Sarah" does not include any such fast-paced chase. Even if the pace is described as substantially similar, as compared to the other elements, it would be an inconsequential similarity. *See Williams,* 84 F.3d at 590 (recognizing that although the pace of the works was similar, "pace, without more, does not create an issue of overall substantial similarity between the works.").

For all of these reasons, as a matter of law, the extrinsic elements of each work are not substantially similar.

### b. Intrinsic Similarity

■ The second prong of the substantial similarity analysis requires a comparison of the "expression of [the] ideas" between the two works. *Dawson,* 905 F.2d at 731. A court must "inquir[e] into the 'total concept and feel' of the works" through the eyes of the intended audience—here, a lay moviegoer. *Id.* "[W]hile there are some superficial similarities between the two works, no ordinary member of the [movie] viewing audience would find the programs substantially similar; in fact, precisely the opposite is the case, for the total concept and feel of the two programs is palpably different." *Eaton,* 972 F.Supp. at 1029.

---

**28.** As stated earlier, Man recognizes that Sarah is the one who shot him during the robbery, but this does not discourage him from

going through with the wedding anyway—a somewhat bizarre ending to the screenplay.

The total concept and feel of both works is quite different. After reading "Sister Sarah," a lay observer will not become attached to the characters, will not understand why the gang was committing crimes in the first place, and will not feel a sense of sympathy for them; these are all inevitable consequences of the superficial character, theme, and dialogue development of the screenplay. The concept and feel of "Set it Off" is quite different. In that work, the central aspect of the movie is friendship and closeness, as the protagonists struggle to overcome individual crises. The tragedy and desperation are truly experienced by the viewer. Thus, as a matter of law there is no intrinsic similarity between the two works. Accordingly, as there is no substantial similarity under the extrinsic or intrinsic tests, I will grant summary judgment for the defendants.[29]

### B. Robinson's Unfair Competition Claims

 Robinson's unfair competition claims, under the Lanham Act, 15 U.S.C. § 1125 *et seq.* and under common law fail as well. Robinson alleges that defendants' "passing off of 'Set it Off' as their own creation and property constitutes unfair competition and utilization of a false designation of origin." Compl. at 12. The Lanham Act "prohibits any misrepresentation likely to cause confusion as to the source or the manufacturer of a product." *Lipton v. The Nature Co.,* 71 F.3d 464, 473 (2d Cir.1995).[30] When a creative work is involved, "the Lanham Act may be used to prevent the misappropriation of credit properly belonging to the original creator of the work." *Waldman Pub'g Corp. v. Landoll, Inc.,* 43 F.3d 775, 781 (2d Cir. 1994). In *Waldman,* the court analyzed a similar claim of "reverse passing off," that is, where plaintiff claims that the defendants' reproduction of a creative work with a "false representation as to its creator" violates the Act. *Id. Waldman* allowed the claim to go forward, however, the court held that to satisfy the Act's "false designation of origin" prong, the proper test was the "substantial similarity" test utilized in Copyright law. *Id.* at 783. Therefore, in order to succeed in showing a false designation of origin, a plaintiff must demonstrate "copying ... as it is [established] in copyright infringement." *Id.* Because Robinson has failed as a matter of law to show substantial similarity between his work and that of the defendants, he can not maintain his Lanham Act claim.[31] There can not be a "failure to attribute authorship" within the ambit of "reverse passing off" under the Lanham Act when the "work at issue [did not] originat[e] with the plaintiff." *Lipton,* 71 F.3d at 473.

---

**29.** Defendants' argument that Koules, Pollock and Lanier can not be held liable for copyright infringement because they were not accused of copying Robinson's script is moot. An individual can be held vicariously liable for copyright infringement if he or she "possess[es] the right and ability to supervise the infringing conduct [and] have an obvious and direct financial interest in the exploitation of materials." 3 *Nimmer on Copyright,* § 12.04A, 12–66. Similarly, a party, "who with knowledge of the infringing activity, induces, causes, or materially contributes to the infringing conduct of another, may be held liable as a contributory infringer." *Id.* at 12–72. Because there is no substantial similarity between the two works, it is unnecessary to determine if Koules, Pollock, and Lanier fall into either of these categories.

**30.** The Lanham Act states that "any person who, on or in connection with any goods or services ... uses in commerce ... any false designation of origin ... which is likely to cause confusion ... as to the origin ... of his or her goods ... shall be liable in a civil action." 15 U.S.C. § 1125(a).

**31.** Under the Lanham Act, Robinson would still be required to prove a likelihood of confusion, even under the *Waldman* standard. It is not necessary here to parse the split between the Ninth Circuit, which requires a showing of "bodily appropriation" to prove consumer confusion, *see Shaw,* 919 F.2d at 1364, and the Second Circuit, which does not follow such a bright-line rule, *see Waldman,* 43 F.3d at 784. A reasonable fact finder could not conclude there is a likelihood of confusion between the two works. *See e.g., Takeall,* 809 F.Supp. at 23–24 (granting summary judgment for defendant on plaintiff's "reverse confusion and passing off" and unfair competition claims).

■ Because Robinson's Lanham Act claim fails, in part because Robinson can not establish a likelihood of confusion between his work and "Set it Off," summary judgment in defendants' favor on Robinson's common law unfair competition claim is also warranted. *See Perini Corp. v. Perini Constr., Inc.*, 715 F.Supp. 719, 721 (D.Md.1989) (holding that the same legal standard applied to plaintiff's unfair competition and federal Lanham Act claims). *See also Takeall*, 809 F.Supp. at 23–24(granting summary judgment on plaintiffs unfair competition claims because there could be no finding of a likelihood of confusion between the two works). In so concluding, I assume, without deciding, that his unfair competition claim is not preempted. *Compare Hicks v. Maryland*, 109 Md.App. 113, 674 A.2d 55, 61 (1996) (stating that the Copyright Act "is not intended to preempt common law protection in cases involving activities such as false labeling, fraudulent representation, and passing off even where the subject matter involved comes within the scope of the copyright statute") *with Wharton v. Columbia Pictures Indus.*, 907 F.Supp. 144, 146 (D.Md.1995) (holding that plaintiff's misrepresentation common law claim was the " 'equivalent' to the right to prepare derivative works because each concerns the central allegation that Defendants plagiarized the copyrighted screenplay;" therefore, it was preempted); *The Progressive Corp. v. Integon P&C Corp.*, 20 U.S.P.Q.2d 1682, 1687, 1991 WL 218010 (4th Cir.1991) ("State unfair competition claims based on misappropriation protect the same rights as Congress sought to protect by the Copyright Act and are therefore preempted.").

## IV. CONCLUSION

For the reasons stated above, summary judgment shall be granted in favor of defendants. An order follows.